Sweeney, J.
The issues before the court at the trial of these consolidated cases arise from the September 1999 eminent domain land takings by the City of Springfield of three the corporation could build, own and operate a minor league baseball stadium on the land. All of the parties before the court seek a declaration of their rights with respect to the disputed land takings and each party seeks differing forms of equitable relief. Based on the evidence and the applicable law, the court finds that the takings were not a valid exercise of the general eminent domain powers of the City and were not primarily made for a public purpose. The September 23, 1999 takings of the subject parcels are set aside pursuant to the court’s Declaration of Rights of the Parties and Order for Declaratory Judgment entered in accordance with this decision.
BACKGROUND AND PROCEDURAL HISTORY
On September 22, 1999, the Springfield City Council voted to take by eminent domain three privately owned parcels of land for “municipal purposes.” Immediately thereafter, the mayor approved the orders of taking and they were recorded in the Hampden County Registry of Deeds on September 23, 1999. The three parcels are located at the northern end of the City’s central business district and are sometimes collectively referred to as the Main-Congress block. It is undisputed that the City took the parcels by eminent domain for the purpose of leasing the property to the Springfield Baseball Corporation (hereinafter SBC) in order that SBC could build a baseball stadium on the site for use by SBC’s minor league baseball franchise.
As of the date of the takings, Parcel #1 (hereinafter Northgate parcel) was owned by Northgate Center, LLC.[1] Parcel #2 (hereinafter Conefam parcel) was jointly owned by the Trustees of the Conefam Realty Trust,[2] Paul Sears (individually) and the Trustees of the Estate of Eleanor S. Dashevsky.[3] Parcel #3 (hereinafter Dreison parcel) was owned by Dreison Investments, Inc.
Summary descriptions of the parcels are as follows:
1. The Northgate parcel is located at 185 Main Street. The parcel contains 132,630 square feet of land with a four-story office building and strip mall thereon. The City Council awarded pro tanto damages of two million two hundred eighty-seven thousand ($2,287,000) dollars.
2. The Conefam parcel is located at 1985 Main Street. The parcel contains 2,903 square feet and abuts the Northgate parcel. The City Council awarded pro tanto damages of one thousand ($1,000) dollars.
3. The Dreison parcel is located at 40 Congress Street. The parcel contains 106,447 square feet with a manufacturing plant thereon. The City Council awarded pro tanto damages of one million *380 six hundred thirty-seven thousand five hundred (1,637,500) dollars.
Within the time allowed by law, four hundred fifty-four (454) referendum petitions protesting the takings orders and containing the signatures of more than 12% of Springfield’s registered voters were filed with the City Clerk. (See G.L.c. 43, §42-Local Referendum Law). Following the Springfield Election Commission’s certification of the necessary signatures but before the City Clerk submitted the orders to the City Council for reconsideration, as required by G.L.c. 43, §42, several complaints for relief arising out of the takings were entered in the Supreme Judicial Court and the Superior Court. One of the cases was dismissed by agreement.[4] The remaining cases were consolidated for trial before this court. The cases now before the court were initiated as follows:
City of Springfield, et al. v. Dreison Investments, Inc., et al. (hereinafter City case), was filed in the Supreme Judicial Court on October 25, 1999. The owners of the three parcels at issue here are named defendants, as are the Springfield City Clerk and the three sponsors of the referendum petition. A Single Justice (Lynch, J.), allowed three taxpayers to intervene as plaintiffs, limited to the constitutional claims raised by the City.[5] In its complaint, the City asked the high court to exercise its equitable jurisdiction (G.L. 214, §1 and G.L. 231A, §1) and general supervisory power (G.L. 211, §3) and declare that the takings orders for the subject parcels were not “measures” within the meaning of G.L.c. 43, §42 and thus not subject to a referendum vote and further to declare that the takings were not subject to referendum “because undoing an eminent domain taking after rights vest violates the Massachusetts Constitution . . . (and) . . . the United States Constitution.” The City asked that the Court preliminarily enjoin the City Clerk from laying the taking orders before the City Council for reconsideration and from printing ballots for an election on the referendum petition. The Single Justice declined the City’s request for relief under G.L.c. 211, §3, and ordered that the City’s declaratory claim be transferred to the Hampden County Superior Court. On November 19, 1999, the case was entered on the Superior Court docket.
Dreison Industries, Inc. v. Michael Albano, Mayor, et al. (hereinafter Dreison case), was entered in Hampden County Superior Court on October 25, 1999. Its complaint is in the form of a petition for a writ of mandamus, requesting that the court order the defendants (the mayor, the City Council and the City immediately to pay) Dreison the one million six hundred thirty-seven thousand five hundred dollar ($1,637,500) pro tanto damage award provided for in the September 1999 taking order.
Northgate Center LLC, and Gilbert Cohen, et al. v. City of Springfield, et al. (hereinafter Northgate case), was originally entered in Suffolk County Superior Court on October 25, 1999 and, by this court’s order, was transferred to Hampden County and consolidated with the other cases herein. In its complaint for cer-tiorari, the plaintiffs allege that the Northgate and Conefam parcels were taken in violation of the provisions of G.L.c. 121B (the Urban Renewal Law).[6] By separate count, the plaintiffs allege that their property was not taken for a public purpose. The plaintiffs request that the court nullify the taking and award them damages for the loss of use of the property and diminution in its value caused by the taking order.
After the case was transferred to this court by the Single Justice, the City renewed its motion for a preliminary injunction. Following a hearing on the motion, the court entered a temporary restraining order prohibiting: 1. the City from taking any further action to enforce the takings; 2. the City Clerk from laying the taking orders before the City Council for reconsideration and from printing ballots for an election on the referendum petition;[7] 3. the City Council from voting reconsideration of the orders of taking; and 4. the City Treasurer from paying the City Council’s award of damages for the parcel. The court further ordered the Dreison and Northgate cases consolidated with the City case and advanced the cases for trial.
FACTS
Based on the evidence and reasonable inferences drawn therefrom, I find the following facts:
Efforts to Bring Professional Baseball to Springfield — During part of the 1980s, Richard Neal was mayor of Springfield. He and other municipal officials and interested citizens formed a minor league baseball committee to explore the feasibility of attracting a minor league baseball franchise to Springfield. Michael Graney was employed by the City as the General Manager of the Springfield Civic Center during this time and, in that capacity, served on the committee. Over a decade later, Mr. Graney would play a pivotal role in the events surrounding the takings at issue here. Although the committee worked diligently to attract a baseball franchise to the City, their efforts were unsuccessful. In 1988, the committee made presentations to the Class AAA International League and the Class AA Eastern League demonstrating the desirability of choosing Springfield as a franchise location. The leagues’ interests in Springfield, if any, did not include building a home stadium for a franchise team. The quest to find a baseball franchise lay dormant from 1988 to 1992.
Michael Albano is currently the mayor of Springfield. In 1992 he was a member of the Springfield City Council. At that time he formed a committee to renew exploring the feasibility of attracting a professional baseball franchise to Springfield. Named the “Bring Back Baseball Committee” (hereinafter “the committee”), it was headed by a City Councillor and a businessman and its membership included business *381 owners, civic leaders and other individuals from the metropolitan Springfield area. In approximately 1994, the committee contacted representatives of the owners of the Boston Red Sox. The Red Sox expressed a tentative interest in negotiating a Class AA affiliation agreement with a Springfield franchise team, provided that an existing baseball franchise agree to relocate in Springfield and provided that a new stadium be constructed to house the franchise team. Encouraged by the Red Sox’s expression of general interest in Springfield as the site of a farm team, the committee set about finding a team, investigating potential sites for a baseball stadium and looking into ways to finance the acquisition of a site and the construction of a ballpark. The committee was assisted in these endeavors by Hellmuth Obata Kassabaum (hereinafter HOK), an architectural firm specializing in stadium design. Studies undertaken in consultation with HOK indicated that the costs would be well in excess of ten million ($10,000,000) dollars.
The committee, then-Mayor Robert Markel and other City officials, considered ways to raise money to meet the anticipated capital costs. William Weld was then governor of the Commonwealth. After discussion with City officials and the committee, the governor publicly pledged to provide approximately ten million dollars from state coffers for the acquisition and construction of a stadium. The record is devoid of any evidence as to the particular source of the promised state funding and, assuming the funds were available and legally justifiable for the use stated, what entity would receive those funds. Armed with the governor’s promise, Mayor Markel, some City officials and the committee entered into serious negotiations with the owner of the New Britain Red Sox, a Class AA affiliated team, to move the team from New Britain, Connecticut to Springfield. The owner of the New Britain team made it clear that he would only move the team to Springfield if a suitable stadium were built by the 1996 baseball season.
Chicopee River Site Selection — Site selection, acquisition and stadium construction now became urgent among those working to bring professional baseball into the City. Assisted by advice from HOK and working in close collaboration with Springfield officials, the committee identified a desirable site located in the Chicopee River Business Park (hereinafter “Chicopee River parcel”). The Chicopee River parcel was vacant land straddling the boundaries of Springfield and Chicopee. The City of Springfield owned part of the vacant parcel, as did the WestMass Area Development Corporation (hereinafter “WestMass”). WestMass supported the committee’s efforts to develop the Chicopee River parcel for use as a minor league baseball stadium. Although the record is not clear as to exactly how much money all of this was to cost and what entity would own or manage the stadium, it appears that Mayor Markel and the City Council anticipated that Springfield would own at least a portion of the stadium. As noted, the City already owned a piece of the Chicopee River parcel, the proposed site of the stadium. Moreover, on August 24, 1994, a proposed order was read to the Springfield City Council' seeking an appropriation of two million ($2,000,000) dollars for the “design and construction of a baseball stadium,” and an authorization for the City Treasurer, with the approval of the mayor, to borrow funds under General Laws, c.44, §7, to meet the requested appropriation. A second reading of the proposed order to the City Council occurred eight months later, on May 1, 1995. On that date the City Council passed the order in exactly the form originally read. The following day, Mayor Markel approved the order. The proposed order did not make reference to any of the subsections of Section 7. In response to an inquiry by the court, the City indicated that the bonds would be issued pursuant to G.L. 44, §7(25), which imposes a maximum fifteen-year term limit on bonds issued “for the construction of municipal outdoor recreational and athletic facilities, including the acquisition and development of land and the construction and reconstruction of facilities.”
Because the Chicopee River parcel was apparently agreeable as the site for a publicly funded stadium, the New Britain franchise, with the implied blessing of the League, seemed poised to move the team to Springfield. With the governor promising ten million dollars in state money and with the City Council on the verge of final approval of a two million dollar appropriation for use in stadium construction, the committee was sure that professional baseball was about to arrive in Springfield. Again, the trial record does not reveal how the proposed state and municipal funding would have been specifically used or what controls either the state or the City would have over the use of the stadium. Nor does the record reveal whether the stadium was to be publicly owned or, if so, what lease, license or concession arrangements were under consideration in order to protect public funds and public property from being used primarily to benefit a private corporation, i.e., the New Britain franchise. Whatever the contemplated arrangement was, it became meaningless in late 1994 or early 1995, when the owner of the New Britain franchise announced that the team was staying in Connecticut, in part because of financial incentives provided to the franchise by the State of Connecticut and the City of New Britain.
Harrisburg Agreement — Following this disappointment, the City officials and the committee began negotiations with the owners of the Harrisburg, Pennsylvania franchise. Governor Weld renewed his commitment to provide state funding to bring the Harrisburg franchise to Springfield. The City Council, with the mayor’s approval, authorized the earlier referenced two million dollar appropriation. The owners of the Harrisburg franchise signed a lease to play in *382 the Chicopee River parcel stadium. There is no evidence before the court of any of the terms of that lease, including the identities of the lessor and lessee. However, it is clear that the lease was certainly contingent on a stadium being built, since there was nothing but vacant land on the Chicopee River parcel when the lease was signed. Additionally, the court infers the lease was conditional on League approvals. Mr. Graney’s testimony established that the Harrisburg franchise was part of the Eastern League and, in order to move the franchise to Springfield, approvals had to be obtained from the League and its national governing body, as well as from Major League Baseball. At least some of the approvals were dependent on whether the Red Sox would prefer an affiliation with a AA team located in Springfield, rather than elsewhere. Because of ongoing positive discussions with Red Sox owners, City officials were hopeful that the approvals would be forthcoming. The evidence before the court on this issue is no more specific than that just stated. In any event, after signing the lease for the Chicopee River parcel stadium, the owners of the Harrisburg franchise sold the team to the City of Harrisburg, Pennsylvania and the team remained in Harrisburg. Some type of monetary settlement was paid to Springfield by Harrisburg. Although there is no further specific evidence on this point, evidently this settlement resulted from a legal action or threatened legal action by Springfield against Harrisburg for interfering with a legally protected interest which Springfield had in the lease. Negotiations then began with Capital Baseball, whose owner was attempting to secure a major league franchise and was willing to consider Springfield as location for the desired franchise. These negotiations continued from the end of the Markel administration and into the Albano administration.
Baseball and Mayor Albano’s Economic Development Plan — Mayor Albano is an integral part of the efforts to bring professional baseball to the City of Springfield. As noted earlier, as a member of the City Council he had initiated the organization of the committee and actively participated in it. He was elected mayor of Springfield in late 1995 and sworn into office in January 1996. He remains in that position to date. From the beginning of his tenure as mayor and continuing to date, Mayor Albano, together with what he alternatively terms as his “economic development team” or his “economic development cabinet,” holds the opinion that retail businesses in general cannot successfully operate in the City’s central business district. Like so many other cities, the economic base of Springfield’s downtown was depleted by the migration of retail stores to suburban malls. Describing it as his “vision” for the City, the mayor believes that the sound economic health and viability of the City’s central business district can best be realized through the integration of traditional business day office use with athletic and sporting activities, cultural events, conventions and tourism focused on “family oriented themes." In the opinion of the mayor, a stadium designed for use by a baseball franchise, along with other entertainment-focused improvements, would revitalize the downtown area.
The mayor is finalizing a proposed new master plan for Springfield and its central business district called “Springfield Vision 2000.” The City’s central business district is approximately a mile long and is bounded on the west by the Connecticut River. According to “Springfield Vision 2000,” the proposed baseball stadium would anchor the northern end of the central business district. The Basketball Hall of Fame, which is located in an urban renewal area, anchors the southern end of the central business district. The Hall of Fame is not owned by the City but the City works closely with the Hall of Fame’s trustees. A new Hall of Fame is well into the final stages of development. The Hall of Fame is located in the Riverfront Park area. Under the mayor’s guidance, the City has expanded and improved Riverfront Park, which runs along the east bank of the Connecticut River. The City plans to continue the improvements by contributing public resources to the River Walk and the Bikeway Project. The Springfield Central Library and Springfield Museums are on the east side of the central business district. The Dr. Seuss National Memorial project is well underway in that area.[8] The Springfield Civic Center is located between the library and the riverfront. The Massachusetts Convention Authority has assumed ownership of that facility and is in the process of designing a plan for its renovation and expansion. Symphony Hall is located next to City Hall in the heart of downtown. It is the home of the Springfield Symphony Orchestra and the site of numerous of cultural, artistic, and civic events and public forums. CityStage is located about three blocks north of Symphony Hall. A few years ago, the local theater company, StageWest, was no longer able to sustain itself. It was replaced by CityStage. The City funded the first year of CityStage in order to get it up and running. The Marriott and Sheraton hotels are located within a few blocks of most of these attractions. A Holiday Inn is located near the subject parcels.
Upon assuming office in 1996, Mayor Albano was aware that the then mayor of Chicopee was not enthusiastic about using the Chicopee River parcel for a baseball stadium, instead of for industrial or business uses. This fact, coupled with Mayor Albano’s own vision for downtown Springfield, propelled him to look for suitable sites for a stadium in the downtown area. Mayor Albano testified that he believes professional baseball would increase public spirit and pride in the City and the anticipated visitors to the stadium would patronize nearby restaurants and cafes and enjoy other downtown amenities. This “spin off’ business would benefit downtown merchants and contribute to the overall economic health of Springfield’s central business airea. In his opinion, a baseball stadium located on the subject parcels would draw an addi *383 tional 250,000 people into Springfield each year. The mayor did not offer a basis for this figure and the studies prepared for the stadium project do not begin to approach that estimate. The City’s planning department, the committee and the Springfield Business Development Corporation (hereinafter SBDC), a not-for-profit development corporation, considered various sites in or near downtown. Mr. Graney, no longer employed by or on behalf of the City, was president of SBDC when the downtown site search began in 1996. He remains in that position today.
In April 1996, the City’s planning department submitted a bare bones report to the mayor regarding potential downtown sites. The planning department’s submission states: “This report takes a cursory look a[t] two potential sites for a downtown AA baseball stadium.” The first site was the 6.3 acre Main-Congress site, including the parcels that are the subject matter of the cases at bar. The second site was the 9.4 acre Carew-Bond-Patton site (named by street boundaries).
All three parcels in the Main-Congress site were occupied by businesses or industry. The planning department’s report noted that the Main-Congress site would provide for a ballpark facade on Main Street with high visibility from an elevated portion of Interstate 291, which runs parallel to the site and joins Interstate 91 just east of the site. Additionally, an Italian restaurant could remain, although a portion of its parking would be acquired for the stadium. In the planning department’s view, the site offered “a blend of downtown urban opportunities . . . and a wide latitude of spin-off attractions.” On the downside, the report recognized that the site was part of an urban renewal plan, that it was in reasonably good condition and that “relocation costs may be prohibitive or unpopular.” The planning department estimated acquisition, relocation, demolition and site preparation (which did not include stadium constructions costs) of four million seven hundred thousand ($4,700,000) dollars for the Main-Congress site.
The Carew-Bond-Patton site consisted of 41 parcels, 18 of which were vacant land, 3 of which contained vacant buildings and several of which contained boarded-up residential buildings. Within this area was a mental health center located on state land. This center provided essential services to the inner-city community. A vacant school owned by the City was also located on the proposed site, as were a gas station, a small facility owned by an electric utility company and two large warehouse /factory buildings that were in general disuse and disrepair. Two apartment buildings within the site are listed on the National Register of Historic Places and several of the remaining parcels are eligible for listing, including the “Trolley Barn.” The planning department described the Carew-Bond-Patton site as “one of the most blighting sections of the City, suffering from a lack of reinvestment by both the private and public sectors.”
Visibility of the Carew-Bond-Patton site from 1-291 was essentially the same as for the Main-Congress site. The only difference is that Carew-Bond-Patton abuts the highway on the north while Main-Congress abuts it on the south. Since downtown is south of 1-291 and thus visually separated from the Carew-Bond-Patton by the highway, the planning department felt that this visual separation might be a drawback and “hurt the potential for spin-off development.” Factors in favor of the Carew-Bond-Patton site included its easy accessibility from major city thoroughfares as well as from the highway. In addition, the planning department reported that the site would “fill out a well defined urban block,” although the design of the stadium should “work around” the mental health center and historic properties. The planning department estimated acquisition, relocation, demolition and site preparation (which did not include stadium construction costs) of four million eight hundred thousand ($4,800,000) dollars for the Carew-Bond-Patton site.
Selection of Main-Congress Site and Unrealized Financial Promises — Through some unexplained financial device, the City provided SBDC with the settlement funds from the failed Harrisburg deal in order for SBDC to contract with HOK to update information about desirable site locations. As the site selection process continued, the City was still trying to land a baseball team. According to the testimony of Mr. Graney and the mayor, negotiations with Capital Baseball culminated in what the mayor and Mr. Graney thought was an informal agreement with Capital Baseball for a franchise team. Although the terms of this supposed informal agreement were not offered at trial, the agreement was coincident with the mayor, the committee and SBDC agreeing that the Main-Congress site would be the location of the baseball stadium. This site was of particular appeal because almost abutting the site is a large unused parking lot owned or controlled by the City or an authority under its auspices. Thus, space and financing for parking facilities were not a concern. Governor Weld once again renewed his commitment of ten million dollars in state funds for the project. In June 1996, a public announcement of professional baseball’s impending debut in Springfield was made by the mayor and others. For reasons undisclosed at trial, Capital Baseball and Springfield severed their dealings almost immediately after the June announcement.
In July 1996, Mayor Albano announced that baseball would return to Springfield through an organization known as Springfield Baseball Club, LLC and that the stadium would be built at the Main-Congress site. Martin Stone was the principal owner of Springfield Baseball Club, LLC. Mr. Stone owned the Class AAA Minor League Phoenix Firebirds. Mr. Stone did not *384 own a AA franchise but two AA extension franchises were available from the Major League. Mr. Stone applied to the Class AA Expansion Committee for one of the extension franchises. With Governor Weld and Mayor Albano accompanying him, Mr. Stone made a formal presentation to the expansion committee in August 1996. A few months later, the expansion committee awarded one of the two available franchises to Mr. Stone, with Springfield designated as the home of the franchise. The Weld administration again underscored that significant funding would be provided from state coffers to help build the stadium. The mayor expected to receive fourteen million ($14,000,000) dollars of state aid.
A short time after the franchise award, the reality of actually delivering on grand promises of public dollars in partial support of private business set in. Other than specific monetary promises from the governor, the record does not reveal whether any legal or other necessary steps were taken to define the source of the state funding or the manner by which it would be distributed. Once the Springfield/Stone franchise was announced, the governor and mayor approached the state legislature for the ten million dollars the governor had promised. They walked away empty-handed. According to the mayor’s testimony, Speaker of the House of Representatives Thomas Finneran was adamant that taxpayer dollars should not be used to build stadiums for the purpose of benefitting privately owned baseball franchises. The Speaker represented that he was not opposed to legislative funding of infrastructure improvements attendant with new stadium construction, such as access roads, sidewalks and the like. Without a stadium financed by the public or by someone other than himself, Mr. Stone declined to finalize the franchise agreement and the League revoked its commitment to locate a AA team in Springfield.
Baseball Supporters and the Mayor's Advisors— After this major disappointment, Mayor Albano, the Committee and SBDC continued their efforts to lure a Class AA expansion franchise to Springfield. They were unsuccessful in these final efforts because franchise owners did not want to contribute toward stadium construction due to the impact it would have on franchise profits.
From the evidence, particularly through Mayor Albano’s testimony and the documentary exhibits, it appears that disappointment over City’s inability to attract a minor league affiliated baseball franchise set into motion a series of events and decisions on the part of certain officials, organizations and individuals to bring some type of a professional baseball team to Springfield through whatever means possible. As will be seen, baseball became the all-consuming goal and the propriety of public funding to obtain that goal became, at best, secondary. In order to understand the events that followed the aborted Stone franchise, it is necessary to identify the individuals who played a central role in bringing about the land takings at issue here and to understand the relationships those individuals have with the City and with private organizations which have an interest in the construction of a baseball stadium.
We start with Michael Graney. From 1986 through 1990, Mr. Graney was manager of the Springfield Civic Center which was owned by the City. From 1990 to 1995, he continued to manage the Civic Center under a private management agreement with the City. In 1996, he was named president of the Economic Development Corporation of Western Massachusetts (hereinafter EDC). EDC is a not-for-profit corporation whose directors and advisors include government officials and business and civic leaders in Hampden, Hampshire and Franklin Counties. EDC is the umbrella corporation that in varying ways manages and oversees a host of other development organizations and non-profit corporations doing business in the three counties. Mr. Graney’s salary is paid by EDC. Stemming from his position as president of EDC, Mr. Graney serves as president of SBDC, and stemming from that position he serves as president of the Springfield Performing Arts Development Corporation which manages Springfield’s Symphony Hall and CityStage.
Mr. Graney is also president of Springfield Baseball Corporation (SBC). SBC is in some manner under EDCs umbrella, although the specific lines of authority from EDC to SBC were not detailed at trial. As will be seen, the origin and involvement of SBC in the events that led to the dispute before the court are pivotal. According to Mayor Albano, Mr. Graney is part of the mayor’s economic development team and a member of the mayor’s “economic development cabinet.” This group is comprised of the City’s Planning Director, Community Development Director and Economic Development Director. Mr. Graney is its fourth member and the only one not employed by the City. The mayor’s testimony made it abundantly clear that the mayor considers Mr. Graney to be an agent of the City and a core policy maker concerning what is in the best interests of Springfield, as a governmental entity. The fact that Mr. Graney is paid by a non-governmental organization (EDC) and is the chief executive officer of SBC, which will be the direct beneficiary of these takings, is of no consequence to the mayor. He repeatedly reminded the court that Mr. Graney and other representatives of SBC were part of the “same team” and neither the City nor SBC held interests different from the other. Mr. Graney’s view is the same. Indeed, Mr. Graney testified that he views the mayor’s economic development cabinet as an official agency of the City.
A. Craig Brown is an attorney and a partner in the Springfield law firm of Doherty, Wallace, Pillsbury and Murphy. He specializes in general business practice with a focus on commercial real estate development *385 and nonprofit corporations. His Springfield-based development and nonprofit corporate clients include the Basketball Hall of Fame, the Riverfront Development Corporation, the Upper State Street Development Corporation, the Brightwood Development Corporation, the Springfield Urban League and the Springfield School Volunteers, Inc. Most importantly, for purposes of this case, he is counsel to SBC, as well as serving as its clerk and a member of its Board of Directors.
Peter L. Picknelly, Sr. is a prominent local businessman. He owns substantial interests in a number of commercial enterprises, including Peter Pan Bus Lines, Inc. He is involved in a number of philanthropic and civic organizations and projects. Until sometime in 1999, he was Director of SBC. When he resigned from that position, he was replaced by his son. Mr. Picknelly pledged a substantial contribution toward the construction of the stadium at issue here. In addition, Peter Bus Lines, Inc. bought the “naming rights” to the stadium.
Stadium Ownership Concept — As recounted earlier, by 1997 all attempts by the Ciiy to build and own a stadium in order to attract a AA baseball franchise had failed. The anticipated financial windfall from the state was not to be. The City did not have a stadium to house a team and evidently no franchise was willing to take money from its own pockets to build a stadium in Springfield. The mayor and his economic team, which included Mr. Graney, were still convinced that baseball was essential to the economic regrowth of the City’s central business district. With the assistance of Mr. Brown and others, they devised a strategy that would allow a not-for-profit corporation to acquire land, construct a stadium and own a AA League affiliated team. They decided on this ownership model because a not-for-profit corporation could supposedly finance the costs of land acquisition, stadium construction and franchise acquisition using anticipated net operating revenues generated from home games and other anticipated stadium events and using fees from concession licenses, and not be concerned with realizing a net profit. Mr. Brown, Mr. Graney and others, with the mayor’s approval, began the process of forming a not-for-profit corporation. Timing was critical because only one AA expansion franchise was available. As an interim measure, the Bring Back Baseball Committee (committee) was converted to Springfield Baseball, LLC. This organization hired Mesirow Financial (hereinafter Mesirow) to prepare pro forma financial statements to confirm the group’s expectations that a not-for-profit corporation could somehow obtain financing to acquire land, build a stadium on it, purchase a AA expansion team and pay back the financing from the net operating revenue the group hoped would flow from anticipated uses of the proposed stadium. The proposed stadium site remained the Mam-Congress block. In late 1997, armed with pro forma financial statements from Mesirow, Mr. Graney, representing Springfield Baseball, LLC and Mayor Albano, met with the AA Expansion Committee and applied for the last available expansion team. They were not successful; the franchise was awarded to Altoona, Pennsylvania. Any hope that Springfield would be the home of a AA affiliated team in the reasonably foreseeable future ended with this news.
Springfield Baseball Corporation — Professional baseball, however, was still part of the mayor’s vision of a revitalized downtown. In August 1998, Springfield Baseball Corporation (SBC) was incorporated as a not-for-profit corporation, under the provisions of G.L.c. 180, §1, et seq. As a not-for-profit corporation, it was granted exemption from federal income taxes pursuant to section 501(a) and (c)(3) of the Internal Revenue Code. SBC’s articles of organization state that it was formed for the purpose of engaging in eight activities, including:
(a) To lessen the burdens upon the City of Springfield, Massachusetts in such government’s efforts to rehabilitate downtown Springfield and to revitalize and reinvigorate economic and employment opportunities in this key area by relieving the City of the costs of procuring and sustaining a professional baseball team and by greatly decreasing the cost to the City of building and operating a team in downtown Springfield.
(b) To promote redevelopment of and combat community deterioration in downtown Springfield.
(c) To support and complement existing and proposed tourism and other economic improvement projects on which the City and the Commonwealth . . . are currently working.
(d) To re-establish baseball and softball for inner-city public school students in the Springfield area
(e) To expand employment opportunity and increase the general level of personal income in downtown Springfield; and, in general, to promote the common good and general welfare of the City of Springfield and its people.
(f) To acquire, use or dispose of real estate of personal property of any kind; and to purchase, mortgage, rent or lease real estate or personal property of any kind.
(g) To engage in any other charitable or educational activity permitted under the provisions of Chapter 180 of the General Laws . . .
SBC’s by-laws fix the number of Directors at a minimum of thirteen and a maximum of nineteen. Of the Directors: one must be a “community leader” in the Springfield area; one must hold a position with a western Massachusetts college; one must have a position with the Springfield School Department; three must be representatives from the greater Springfield business community who have shown prior commitment to the work of non-profit corporations; and two *386 must hold positions with economic development or business organizations in the Springfield area. One director must be appointed by the mayor.
Working together, SBC and Mayor Albano along with his advisors, devised a plan to purchase a baseball franchise and construct a stadium. The plan basically contained six factors: 1. Municipal takings of the three parcels; 2. Municipal clearance of the parcels and stadium site preparation; 3. Public funding of the takings; 4. Ground lease of the cleared stadium site to SBC; 5. SBC constructing a stadium with private financing secured by the lease and other contracts; and 6. SBC’s purchase of a professional baseball team.
Northern League Franchise Agreement — Sights were now set lower because the mayor and his advisors knew that SBC was not going to field a minor league team affiliated with Major League Baseball. The mayor and SBC turned their attention to independent baseball leagues that consist of independently owned baseball franchises that are not affiliated with Major League Baseball. Eventually Springfield’s representatives and the SBC began negotiating with what is now known as the Northern League.[9] The negotiations resulted in a written franchise agreement between the Northern League and SBC that was executed in final form in January 1999. Under the agreement, the Northern League granted a franchise to SBC in exchange for five hundred thousand ($500,000) dollars payable in six payments: one payment of fifty thousand ($50,000) dollars at contract signing; four payments of fifty thousand dollars ($50,000) on June 30, 1999, December 31, 1999, June 30, 2000, and December 31, 2000, respectively; and one payment of two hundred fifty thousand ($250,000) dollars on or before May 1, 2001. In the event SBC failed to make payment, the franchise agreement would terminate. However, if SBC failed to make payment because it or its successor obtained a professional baseball franchise within five years of the nonpayment, then SBC was required to pay the entire balance still owing under the agreement. The franchise agreement required the Northern League to guarantee that its Eastern Division would consist of at least six teams within 350 miles of Springfield, as of the beginning of the 2001 baseball season. Under the league constitution and by-laws the baseball season ran from approximately May to September. The maximum permitted number of active players allowed is twenty-two players and the maximum compensation per season for the entire team is $82,000 — an average of $4,000 per player.
Partnership between City and Springfield Baseball Corporation — Because the SBC’s franchise agreement with the Northern League required that SBC’s team play by the 2001 baseball season, time was of the essence. Beginning in late 1998, SBC, the mayor and his various advisors worked out a plan for site acquisition and stadium construction and financing, so that SBC’s team would have a field on which to play. Mr. Graney was one of the mayor’s key advisors on these issues while at the same time representing the financial interests of SBC. The mayor was well aware of Mr. Graney’s dual role, but, as mentioned earlier, he simply had no problem with it. The group endorsed the stadium plan as designed by HOK. The proposed stadium would seat approximately 5.500 people. The estimated budget for site acquisition, site clearance, business relocation, stadium construction, team acquisition and other associated costs was estimated at more than twenty-one million ($21,000,000) dollars. The stadium would be built on the Main-Congress site, which contained the Northgate, Dreison and Conefam parcels.
Financial and Legal Dilemmas — By January 1999, the mayor and SBC, with the assistance of their respective attorneys, developed a legal and financial framework for the acquisition of the parcels and the construction of the proposed stadium. Although the financial structure of the City’s contribution to the project would change in the coming months, as of January 1999 the mayor agreed in principle to expend approximately six million ($6,000,000) dollars for site clearance and acquisition.
Michael Sweet is an attorney who practices law with Mr. Brown. On January 7, 1999, Mr. Sweet wrote to City Solicitor Peter Fenton, memorializing a meeting between SBC and City representatives. This letter reveals how the City, through the mayor, and SBC planned to acquire and build the stadium. It also reviews the legal problems they might face along the way. The letter refers to a December 21, 1998 meeting between Mr. Sweet, Mr. Brown, Mr. Fenton and Mrs. Maureen Hayes of SBDC. As reflected in the letter, the participants in the meeting developed a proposal for the City to acquire the subject parcels through use of its eminent domain powers under G.L.c. 79, §6. The estimated cost to the City for acquisition and site clearance was in excess of six million dollars. SBC planned to obtain and pay for the appraisals that the City would use to set pro tanto damage awards. Evidently the group was concerned that the appraisal requirements of G.L. 79, §7A, might be compromised by such an arrangement.[10] In his letter, Mr. Sweet reported that, “We believe that the procurement and payment by SBC will not create any procedural defects because the appraisal will be certified to the City.” During his testimony, the mayor acknowledged he was aware that the appraisals were conducted under SBC’s auspices but certified to the City and relied on by the City Council when it voted the pro tanto damages awards for the parcels. The mayor conceded the use of privately commissioned appraisals in public takings was unprecedented in his experience.
In his January 1999 letter, Mr. Sweet discussed the fact that the proposed project called for the City to lease the land to SBC for a “nominal rent.” The poten *387 tial problem for the City and SBC was, as Mr. Sweet stated, “the demolition and site preparation will be subject to the public bidding contained in M.G.L.c. 30B for the disposition of city-owned property.” However, Mr. Sweet opined that “given the unique qualifications for a prospective ground lessee of the site . . . we do not believe that the public bidding requirements will create any significant obstacles for the Project.” Nonetheless, Mr. Sweet stated that alternatives should be considered, “such as special legislation that would eliminate the public bidding requirement.” It should be noted that the City has not initiated a request for special legislation.
Another problem that vexed this group was whether the City’s lease of the stadium to SBC for a “nominal sum” would violate art. 46 (the anti-aid amendment) of the Constitution of the Commonwealth. Relying on his analysis of the holding in Helmes v. Commonwealth, 406 Mass. 873 (1990), and on the fact that SBC was a not-for-profit corporation, Mr. Sweet informed Mr. Fenton that he was of the opinion that “the proposed ground lease arrangement would withstand a challenge based upon the anti-aid amendment.”
Site Acquisition Strategy — The mayor offered to acquire and clear the sites with six million ($6,000,000) dollars of public funds, with title to the land remaining with the City. Of this amount, two million ($2,000,000) dollars would come from the May 1995 City Council appropriation for construction of a baseball stadium; that amount was voted when the Chicopee River parcel was the designated location. General obligation bonds would be sold to raise the appropriated funds. The remaining four million ($4,000,000) dollars pledged by the mayor was hopefully to come from two state grants: two million ($2,000,000) dollars from a Community Development Action Grant administered by the state’s Department of Housing and Community Development (hereinafter DHCD) and the remaining two million ($2,000,000) dollars from a Public Works Economic Development Grant (hereinafter PWED), administered by the state’s Executive Office of Transportation and Construction (hereinafter Transportation Department). As will be discussed in detail later, these grants were awarded to the City in September 1999. The CDAG grant is conditioned on a yet to be executed detailed contract between DHCD and the City. SBC and the mayor, along with some of his advisors, agreed that the City would lease the site to SBC who would build the stadium on it.
With the franchise agreement in place, it was now time to obtain and clear the land and begin constructing the stadium. The mayor, Mr. Graney and presumably other advisors devised an unusual strategy by which the City would ultimately acquire the three parcels which are the subject matter of this lawsuit. This arrangement and Mr. Graney’s role in it clearly demonstrate the inappropriateness of the mayor relying on Mr. Graney as one of his “key” representatives in dealing with SBC while Graney was the president of that corporation and was negotiating for and obtaining from the City significant monetary support and concessions for the benefit of SBC. As revealed by both the Minutes of the February 17, 1999 special meeting of SBC’s Board of Directors and the mayor’s testimony regarding his oversight of the franchise acquisition efforts, the mayor, Mr. Graney, and Mr. Brown decided that the City would acquire the three parcels for the stadium, relocate the remaining businesses and demolish the buildings on those parcels.
Because SBC was now obligated under the Northern League franchise agreement, the prospect of the City acquiring the parcels by eminent domain was uncertain. First and foremost, the City Council, not the mayor, had to vote to take the parcels by eminent domain. Second, although pro tanto damages would be awarded for any such takings, the land owners would, in all likelihood, sue the City for damages if they did not agree with the pro tanto awards. Thus, the ultimate cost for acquisition of the parcels would remain uncertain for some time. Based on this analysis, SBC, with the knowledge and approval of the mayor, voted to try to buy the parcels directly from their respective owners. SBC’s Board of Directors authorized Mr. Graney to offer up to two million two hundred seventy-five thousand ($2,275,000) dollars for the Dreison parcel, two million three hundred thousand ($2,300,000) dollars for the Northgate parcel and seventy-five thousand ($75,000) dollars for property that included the Conefam parcel. SBC did not have this money. Obviously, the mayor, Mr. Graney and SBC’s Board of Directors had some tacit agreement that if SBC were successful in purchasing these properties, the City or some intermediary would loan the purchase money to SBC and then the City would buy the parcels from SBC for an unknown price so that SBC could construct its stadium. In his testimony, Mr. Graney acknowledged that the mayor and SBC agreed that if SBC was successful in purchasing the Dreison parcel, the City would buy or take it by eminent domain from SBC.
What is even more remarkable about the land acquisition scheme is that the mayor authorized SBC to broker the City’s eminent domain powers in an attempt to lock up ownership to the Northgate parcel. Mr. Graney, in his dual agent capacity, discussed with SBC’s Board of Directors the particulars of the City and SBC’s land acquisition strategy. The February 17, 1999 SBC Board minutes record that Mr. Graney told the SBC Board that the presence of numerous business tenants on the Northgate parcel presented “related relocation issues” and thus, “this parcel would be acquired most efficiently through eminent domain.” In other words, the City could get the tenants out of the premises faster than a private land owner could. Mr. Graney, with the knowledge and approval of the mayor, told the SBC Board that the corporation could *388 guarantee the amount of damages that the parcel owner would receive from an eminent domain taking by the City in exchange for a release by the owner of any claims arising from the taking. The SBC Board approved this proposal and authorized Mr. Graney to offer Northgate up to two million three hundred thousand ($2,300,000) dollars for a friendly taking of the parcel. Mr. Graney was acting on behalf of the mayor when he made this proposal. Neither SBC nor the mayor has the right or power to take land by eminent domain. There was no evidence about whether any of the City Councillors knew that the mayor and SBC were brokering the eminent domain powers and responsibilities of the City Council. Mr. Graney recalled that he and the mayor discussed the stadium project with the City Council in approximately March 1999 but he did not know if the councillors were aware of the method by which the mayor and SBC had decided to acquire these parcels or if they knew who would own the land under the proposed stadium.
Significantly, the mayor, Mr. Brown and Mr. Graney discussed the fact the Northgate and Dreison parcels were in an urban renewal zone, G.L.c. 121B. Each of them knew and discussed the fact that SBC’s construction of a stadium on these particular parcels would be a material change in the urban renewal plan that governed the use of those parcels. Each of these men knew that an amendment to the plan would require state oversight, specialized studies, public hearings, and a host of other statutory and regulatory requirements before state approval of an amendment would be granted. All of these requirements are designed to protect the public interest in a redevelopment project. In their view, however, complying with these procedures would delay completion of the all-consuming goal of bringing professional baseball to Springfield. In combination with one another, they decided that any eminent domain takings by the City of these parcels would be done for “municipal purposes” under General Laws, Chapter 79, §1 et seq., thus circumventing the urban renewal laws. The mayor testified that the decision of the group (the mayor, Mr. Brown, and Mr. Graney) to use the City’s general eminent domain power was “a high ranking reason for expeditious acquisition of the parcels.” Mr. Brown does not work for a governmental entity and does not owe a duty to the City. However, the mayor certainly does. The businesses operating on the Northgate and Dreison parcels were there as a result of the urban renewal law and were fulfilling the approved goals of the North End Urban Renewal Zone. By his own testimony, the mayor knew of this fact and also knew that an amendment was required under the urban renewal law. As will be discussed later, when the City applied for state grants for the site acquisition, the state official charged with overseeing compliance with the urban renewal laws raised this very issue, but the mayor claimed no amendment was necessary.
Dreison Purchase and Sale Agreement — In accordance with the above described acquisition strategy, Mr. Graney negotiated with the owner of the Northgate property and the owner of the Dreison property. The Northgate negotiation was not successful. However, the negotiation for the Dreison property culminated in a purchase and sale agreement. The agreement was executed on April 22, 1999 with Mr. Graney signing on behalf of SBC as the buyer and Manfred, Rosenkranz, president of Dreison Investments, Inc., signing on behalf of the seller. The agreement states that SBC is buying the Dreison parcel as part of a larger parcel upon which SBC intends to build a baseball stadium. The agreement also states:
The Buyer intends to request that the mayor . . . submit to the City Council... a taking order under which the City takes the Project Parcel for the purpose of the construction of a minor league baseball stadium. The mayor has indicated to the Buyer his willingness to submit such an order to the City Council. . . and his belief that the City Council. . . would proceed with the passage of an order providing for the taking by eminent domain of the entire Project Parcel, including the [Dreison] Premises.
Thereafter, the agreement provides that the seller wishes to avoid the “uncertainties” of a taking and thus is willing to enter into the agreement with SBC. The sales price was two million two hundred seventy-five thousand ($2,275,000) dollars and SBC paid a deposit of one hundred five thousand ($105,000) dollars. The balance was due on June 30, 1999, the agreed closing date. Under the terms of the agreement, if the Buyer extended the closing date, it would pay the seller one hundred thousand ($100,000) dollars per month for the first two months of the extension. After that the buyer would pay the seller five thousand ($5,000) dollars per day until the closing occurred but the extension costs were capped at two hundred fifty thousand ($250,000) dollars. SBC did not close on July 30, 1999. SBC paid one hundred thousand ($100,000) dollars to Dreison for the July extension but did not make payment for the August extension. As we know, the Dreison property was taken by eminent domain in September 1999. The pro tanto damage award was one million six hundred thirty-seven thousand five hundred ($1,637,500) dollars.[11]
The mayor testified he knew of the purchase and sale agreement between Dreison and SBC, including the sales price. As stated earlier, he was part of the group that came up with the strategy of purchase and sale versus eminent domain. The Dreison agreement recites the representations made by the mayor regarding the likelihood of an eminent domain taking by the City Council. On July 23, 1999, City Councillor Timothy J. Ryan wrote to Springfiéld City Solicitor Peter P. Fenton asking for information about several matters relating to the baseball stadium, including financing plans for the proposed stadium, any agreements be *389 tween the City and SBC and any agreements for the sale of the Dreison parcel to the City or SBC. After obtaining information from Mr. Brown as to the SBC matters, Mr. Fenton furnished a written response to councillor Ryan. In response to the question about purchase and sale agreements between Dreison and SBC, Mr. Fenton repeated the response he had received from Mr Brown:
SBC has entered into a real estate agreement with Dreison Investments, Inc., the owner of the Marox Corporation site. This is a private contract between SBC and Dreison Investments, Inc. and SBC is not willing to share this document with the public.
Mr. Fenton added, “The City is not a party to this real estate agreement.” There is no evidence before the court that Mr, Fenton was aware that Mr. Graney, speaking both as a counselor to the mayor and as president of SBC, had represented to the owner of Dreison that the City Council, which included Coun-cillor Ryan, was likely to take his property by eminent domain if he did not sell it to SBC. The mayor, however, knew of Councillor Ryan’s written questions and he knew the answers, as well.
The mayor recognized that the SBC/Dreison agreement was “a material fact” that should be considered by the City Council in what was by that time an imminent City Council vote on land takings for the stadium. Nonetheless, he felt that the terms of agreement should only be disclosed to the City Council in executive session, “so as not to affect other negotiations.” The mayor did not suggest an executive session due to his concern that if the City Council declined to go into executive session and the SBC/Dreison agreement were publicly discussed, “the City’s position would be harmed." The mayor noted that traditionally pro tanto awards were only discussed in executive session so as not to adversely affect any future award of damages against the City. It is somewhat difficult to understand how revelation of the SBC/Dreison sales price would adversely affect the City if Dreison sued for land damages resulting from the taking. To state the obvious, Dreison was a party to the purchase and sale agreement and thus knew the price it agreed to pay.
Interrelationship of Stadium Financing Structure and Proposed Ground Lease — During this same time period and in anticipation of the eminent domain takings of the three parcels, the mayor, his economic development team, the City’s attorneys and SBC through Mr. Brown and Mr. Graney (who was also a member of the economic development team) worked out the provisions of a proposed ground lease. Under this ground lease, the City, after demolishing and clearing the buildings on the three parcels, would lease the land to SBC for a term of not less than twenty-five years and not more than fifty years. SBC would construct a baseball stadium on the site upon which its Northern League franchise team would play its home games. As best as I can glean from the evidence, a draft ground lease was in its final draft form by the summer of 1999. In fact, a copy of the draft ground lease was forwarded to the state in June 1999, as part of the documentary justification for the award of the grants. On August 25, 1999, Mr. Brown forwarded a copy of the draft ground lease to the City Councillors. The draft lease, as presented to the court, differs somewhat from the one presented to the City Councillors on August 25, 1999, which is included in Exhibit 47, the grant documents. The only major difference between the proposed lease introduced as a separate exhibit at trial, Exhibit No. 12, and the one sent to City Councillors in August, 1995, appears to be a quasi-indemnification clause regarding damages arising out of the City’s pending taking of the parcels. Despite the mayor’s efforts at trial to back away from some of the proposed lease provisions, the Exhibit 12 draft ground lease memorializes the specific intentions of the mayor, on behalf of the City, and Mr. Graney and Mr. Brown, on behalf of SBC, regarding the benefits to be realized and obligations to be borne by the respective entities. In order to understand the full implications of that proposed ground lease, it is necessary to detail how SBC, the mayor and his advisors developed the financing structure for the construction of the stadium.
Their plan contemplated that once the City acquired and cleared the land, SBC would build a stadium on the site and own the edifice and control the operation of the stadium. SBC would finance stadium construction through a variety of sources. It planned on selling six million ($6,000,000) dollars of tax exempt bonds, underwritten by Mesirow Financial, Inc. Assuming the bonds sold, the proceeds would be secured by a first mortgage on the stadium. An additional two million three hundred fifty thousand ($2,350,000) dollars would be obtained from loans made by a group of local lending institutions and businesses. This so-called “mezzanine” financing would be secured by a second mortgage on the stadium. In obtaining this conditional commitment, SBC at first indicated to the mezzanine lenders that Massachusetts Development Finance Agency would issue the six million ($6,000,000) dollar bonds. This was not true. Indeed, a representative of that agency found out about the misstatement and contacted SBC to object to it. Presumably, the proposed mezzanine lenders were advised of the erroneous representation.
Mr. Picknelly made a three million ($3,000,000) dollar charitable contribution pledge for stadium construction. Under the terms of the charitable pledge, the three million dollars would be paid over a five-year period, beginning December 31, 1998 and ending on December 31, 2003. The first payment of five hundred thousand ($500,000) dollars was due on December 31, 1998; the second payment of one hundred fifty thousand ($150,000) dollars was due on July 15, 1999, the *390 third payment of three hundred fifty thousand ($350,000) dollars was due within five business days from the City Council’s passage of the eminent domain orders; passage occurred on September 22, 1999. The balance of the charitable pledge was payable in specified installments, with the last payment on December 31, 2003. Mr. Picknelly agreed to execute a note to secure the pledge so that SBC could assign the note as collateral for financing purposes. To date, the note has not been executed.
As can be seen from the terms of the charitable pledge, the City and SBC expected that one million ($1,000,000) dollars from the charitable contribution would be deposited into SBC’s coffers between December 31, 1998, the approximate date that SBC entered into the Northern League finance agreement, and September 30, 1999, approximately five business days after the City Council land takings. In fact, Mr. Pick-nelly made the first two payments of his charitable pledge but despite the council’s passage of the land takings, he has not provided the three hundred fifty thousand dollar payment pledged for September 1999. According to Mr. Brown, the pledge payment due in September 1999 was not paid because of “all of the issues here.” Mr. Brown could not have been referring to the cases before the court because the first cases that arose out of the land takings were filed October 25, 1999. Evidently, Mr. Brown’s reference to “issues” causing nonpayment of the September pledge was to the outcry from some members of the public over the City’s involvement in the land acquisition for a privately owned stadium and to the successful efforts of some local citizens to gather enough signatures to file a referendum petition with the City Clerk to put the question of the City’s involvement in the stadium project to the voters. Since the land takings, however, Mr. Picknelly has given an additional one hundred eighty-five thousand ($185,000) dollars to SBC in order to keep SBC’s operation afloat.
SBC has a pending agreement with Peter Pan Bus Lines, Inc. to sell the naming rights to the Stadium to that company for one million ($1,000,000) dollars. That amount is payable over three years, beginning March 31, 2000 and ending December 31, 2002. Payment is to be made in eight installments of eighty-three thousand three hundred thirty-three ($83,333) dollars.
On September 8, 1999, SBC entered into an agreement with Springfield Media and Telecommunications Group, Inc. (hereinafter “SMTG”). SMTG is a not-for-profit corporation that provides funding for telecommunications production and programming for residents and cable television subscribers in Springfield. Under the agreement SBC granted SMTG exclusive television, radio and other media communication rights to broadcast all stadium events over which SBC has authority or ownership. For events which SBC does not own or over which it does not exercise authority, SBC promised to make good faith efforts to acquire broadcast rights for SMTG, at no cost to SMTG. For these rights, SMTG agreed to pay SBC three million seven hundred thousand ($3,700,000) dollars. Of that amount, seven hundred thousand ($700,000) dollars is payable within fifteen days after SBC secures the financing commitments necessary to develop the stadium. For ten consecutive years, beginning on May 31, 2000, SMTG will pay three hundred thousand ($300,000) dollars per year to SBC. For every year in which fewer than 38 professional baseball games are played in the stadium, SMTG’s exclusive broadcast rights are extended for a year. SBC granted SMTG the exclusive right to sell advertising. The revenue from this advertising would first be used to pay the commission of an advertising consultant and then to pay the yearly television broadcast costs paid by SBC. The remainder would belong to SMTG. SMTG’s rights under the agreement were deemed to run with the land. Thus, SMTG’s rights under the agreement would continue in the event SBC sold its anticipated leasehold agreement with the City to a third party, or sold or otherwise disposed of the franchise or acquired a new franchise. As the anticipated ground lessor, the City through Mayor Albano signed the SBC/SMTG agreement. MediaOne provides cable television services to Springfield residents in exchange for a monthly fee. Under the Federal Communications Act, 47 U.S.C.A. 522, 531 & 542 and under G.L.c. 166A, a percentage of the cable company’s revenue derived from local residents is set aside for public purposes related to media and telecommunications, including funding for public, educational and government access cable television programs. The mayor is the licensing authority for cable television in Springfield. He appointed the members of SMTG to collect and administer the set-aside funds. If baseball advertising revenues are inadequate to meet SMTG’s payment obligation to SBC, the shortfall will come from the local cable television set-aside funds.
Contingent on the execution of all contracts referenced above, as well as on the occurrence of a number of anticipated events, Fleet Bank agreed to make two loans to SBC totaling four million six hundred thousand ($4,600,000) dollars. The loan would allow SBC to obtain in one sum the amounts it would have received in installment payments under the SMTG agreement, the proposed Peter Pan Bus Lines, Inc. agreement and the charitable pledge from Mr. Pick-nelly. The two loans are secured by the SBC’s assignment of the payments owed to it under the SMTG agreement, the proposed stadium agreement and the charitable pledge. The first loan is in the amount of two million six hundred thousand ($2,600,000) dollars, payable by December 31, 2003. That loan would be secured by a first security interest in an Individual Retirement Account to be pledged by Mr. Picknelly. The second loan is in the amount of two million *391 ($2,000,000) dollars and is payable by December 31, 2009.
On September 14, 1999, Springfield’s cable licensee, Media One, committed one hundred thousand dollars “for the funding of baseball,” payable “upon state and local approval of the project.”
In their submissions to various entities, including the applications for state grants, the City and SBC represented that Fine Host Corporation had committed to pay SBC five hundred thousand dollars as a “Concession Rights Fee.” That representation was not true. In a brief one page letter, Fine Host told Mr. Graney that if a financial agreement was reached between SBC and Fine Host, then a profit share ratio would be established along with a management fee to be paid to Fine Host and an investment by Fine Host of five hundred fifty ($550,000) thousand dollars. No agreement has been reached with Fine Host nor has Fine Host paid or committed to pay a concession rights fee.
Terms of Proposed Ground Lease — With the stadium financing plan in mind, the terms and ramifications of the proposed ground lease can be better appreciated. Under the terms of the draft ground lease the City, as lessor, would demolish the buildings on the subject premises, relocate occupants of those premises and prepare the premises so that SBC, as lessee, could proceed with construction of the stadium. More specifically, the City as lessor agrees to provide the site, cleared ofbuildings, free of hazardous substances and in a condition ready for stadium construction, to SBC, as lessee. SBC, in turn, would then construct a stadium on the premises for the primary use of its Northern League franchise team.
There is no specific minimum term of the proposed ground lease. Instead, the proposed ground lease states that the “term of this lease will terminate . . . up to eighteen months from the date of full and complete satisfaction of all obligations of the Lessee secured by mortgage financing as determined by the lessee in its sole discretion . . .” Based on the current proposed financing structure for stadium construction debt, the minimum term would be approximately twenty-five years. The proposed lease sets a maximum term of fifty years. Whenever the proposed lease ends, ownership of the stadium will vest with the City; until that time SBC owns the stadium. Thus, except for the realities of the financial marketplace, SBC could terminate the lease the day after it begins or remain on the site for fifty years, provided it meets its other obligations under the proposed lease. In exchange for SBC building the stadium so that SBC can own and field a franchise team, the City agrees that SBC will not have to pay any rent. Despite the fact that SBC is a not-for-corporation and thus would not have an obligation to pay real estate taxes, SBC would make yearly payments in lieu of real estate taxes. The payment in lieu of taxes is one hundred thousand ($100,000) dollars annually, adjusted every five years to reflect the average of the prior five years’ change in the Consumer Price Index. SBC is only obligated to make this payment from net operating income. The payment is subordinate to the payment of all other debt payments, operating expenses, etc. If there is not sufficient net operating income to make the payments, then the amount owed simply accumulates and whatever remains due at the end of the lease is forgiven. The City and SBC had little, if any, expectation that SBC would realize net operating income and thus be able to make the payment in lieu of taxes.
The draft lease provides that SBC’s use of the stadium is for professional baseball, although the City can consent to SBC using it for other purposes. However, SBC can permit others to use the stadium, such as a “concessionaire, licensee, permittee, operator or otherwise.” Third-party use of the stadium must be consistent with that of a civic stadium. Since the lease is silent on the point, it appears that SBC can set and collect a fee for such “third-party use” and the fee need not be limited to operating expenses. The draft lease references the “lessee’s standard form of use agreement” but if such an agreement actually exists in draft form or otherwise, the court has not seen it. The lease also refers to SBC’s rules and regulations for the use of the stadium. Mr. Brown testified that these rules and regulations have not yet been drafted.
Although the City is entitled to use the stadium for “athletic events and for other civic purposes consistent with the use by municipalities of civic stadiums,” in the event of a scheduling conflict, SBC’s use of the stadium for baseball supersedes the City’s right to use the stadium. The City must pay SBC the operating expenses for its use of the stadium but is not assessed an additional rental amount. The draft lease further provides that the City’s right to use the stadium is “personal to the Lessor, and the Lessor shall not be entitled to assign the Lessor’s rights to any third party.” In his testimony, the mayor spoke about his expectations that the stadium would be available for use by organizations such as the Springfield Symphony Orchestra and the University of Massachusetts baseball team. There was no evidence such groups were ever contacted or that they had agreed in any fashion to use the stadium. That issue aside, in his testimony the mayor initially contended that the City’s right to use the stadium under the terms of the proposed lease includes stadium usage by organizations such as the University of Massachusetts baseball team. The provisions of the draft lease have the opposite result. The City’s use rights are exclusive to the City and do not include organizations such as those mentioned. Under the proposed lease, SBC would contract independently with such organizations and would retain whatever fee was charged for the use of the stadium by such organizations.
*392 While the City cannot assign its “personal” use rights in the stadium, SBC can assign the lease or sublet the premises, provided the City consents. The draft lease requires the City to consent to an assignment or sublet if the following conditions are met: 1. the proposed assignee or sub-lessee has a financial condition reasonably acceptable to the lessor; 2. the proposed assignee or sub-lessee has a business reputation at least comparable to that of SBC’s; 3. the proposed use is one permitted by the lease, “or such other use as permitted by Laws”; 4. SBC is not in default of the lease; and 5. if SBC subleases, as opposed to assigning the lease, the sub-lessee cannot sublet the premises to another. If these conditions are met, SBC is free to assign or sublet the stadium to a profit-making entity and that entity would not owe the City a dime in rent. Moreover, any financial consideration SBC received for such an assignment would inure to its not-for-profit purposes rather than to the City’s benefit.
Under the provisions of the draft lease, SBC may refinance throughout the term of the lease and give first and second place security interests to the lenders, so as long as it does not refinance for more than the original financing in place at the commencement of the lease. However this restriction does not apply if SBC refinances for the purpose of using the stadium for a AA affiliated franchise, provided the franchise is legally locked into the stadium for at least five years following the refinancing. In the proposed lease, the City agrees that SMTG will retain exclusive broadcast rights to stadium events.
The draft lease provides that if the City’s land damage costs exceed the original six million ($6,000,000) dollars, then SBC will, upon demand, reimburse the City for the excess amount. However SBC’s payment responsibility is limited to any net operating income left over after payment of all operating expenses, debt service funding of reasonable operating and capital reserves, and payment in lieu of taxes; although the City can choose to subordinate the payment in lieu of taxes to the excess land damage reimbursement obligation. As with the payment in lieu of taxes, SBC’s debt to the City for payment in excess land damages costs is forgiven upon termination of the lease if SBC cannot pay the excess expenses. To protect whatever financial risk SBC might have in excess land damages, the City grants SBC the right to have an equal voice with the City in selecting the lawyer who will represent the City, to join in settlement negotiations between the City and the land owners and to provide its input on the defenses the City should use. The City must also consult with SBC regarding the demolition of the buildings presently on the site and the relocation of the occupants on the site.
In addition to this partial delegation of municipal obligations to a private entity, the lease also provides that the City grants an irrevocable power of attorney to SBC, so that SBC can obtain any necessary permits, licenses, etc. which would otherwise be sought by the landowner. The obvious and somewhat absurd picture that comes to mind is of SBC using its power of attorney from the City to apply on behalf of the City for some type of license or permit that only the City is authorized to issue, e.g., an entertainment license or sign permit.
One of the final paragraphs of the draft lease states: “The Lessor and the Lessee are not and shall not be considered joint venturers nor partners ...”
The terms of the proposed lease stated the specific final provisions worked out by the mayor and SBC. The City Council’s taking orders were predicated on the specific terms of the proposed lease. The City represented to the state grant agencies that the proposed lease constituted the agreement between SBC and the City. The lenders financing commitments to SBC were based on the terms of the proposed lease. It is abundantly clear that if the referendum petitions had not been filed with the City Clerk and if the resulting lawsuits had not been instituted, the City would have executed a final lease containing the same terms of the proposed lease. As is evident from the lease terms, the vast majority of the lease benefits inure to SBC, not the City.
At trial, the mayor was asked to explain why the City had conceded so many benefits to SBC in the proposed lease. Suddenly the mayor took the position that the proposed lease was now nothing but a “working document” which he was going to renegotiate. In particular when asked how the City reasonably expects to receive a payment in lieu of taxes out of SBC’s net operating income when no income was expected, the mayor said he was going to renegotiate that provision to require that the payment come from net operating revenue. When asked what difference that would make in light of the fact that the lenders held priority positions of repayment over the City, the mayor said he would now renegotiate that provision. It was brought to his attention that if the City insisted on a priority position over the mezzanine lenders then the lenders would withdraw their commitments. The mayor responded that he would simply meet with the lending institutions and secure their agreement to remain in the deal in a weakened security position. This is absurd. Apart from the fiduciary obligations of the institutions to their depositors, Fleet Bank notified the City in 1999 that the mezzanine lenders would not accept a secured position subordinate to the City’s. The mayor knew that when he testified. Likewise he decided on the witness stand that he would negotiate the provisions regarding potential scheduling conflicts between franchise games and civic events. He decided he would also renegotiate the leáse to include non-City civic events within the “personal” use limitation of the lease. The absence of an audit provision in the lease was brought to his attention. The mayor acknowledged *393 that during a meeting with the City Council sometime before the takings, Councillors were concerned that the City would not be able to determine how much revenue SBC would receive from the operation of the stadium. Councillors suggested that an audit provision should be added to the proposed lease. This was not done. Nonetheless, the City Council voted the takings. When confronted at trial with the financial risks attendant on the absence of such a provision, the mayor said he’d renegotiate that provision, as well. Evidently realizing that the City’s six million dollar investment in this proposed project could not be justified on the basis of the proposed lease terms and apparently recognizing that a for-profit entity could purchase the lease from SBC through an assignment, the mayor stated that profit-making was “irrelevant.” According to him, the City never intended to realize any profit from the stadium. In his testimony the mayor interchanged terms like “profit,” “revenue” and “investment protection.” The City’s investment was to provide family entertainment that will create an “economic spin” for business. According to the mayor, this “spin” will create jobs and “provide economic stimulus that produces taxes for the Commonwealth that comes back to the City through economic aid from the state.” He describes the stadium proposal as a “new way of doing business.” It certainly is.
Commonwealth of Massachusetts CDAG & PWED Grants — As discussed earlier, the City’s acquisition of the stadium site was dependent on state aid. The mayor and SBC knew funds were not going to come from the legislative branch. Thus, when they formulated the scaled down “independent league franchise” version of the stadium project, the mayor and SBC decided to look for funds from the executive branch of the Commonwealth. Of the estimated six million dollars needed for site acquisition and clearance, the City could muster only two million dollars from the bond authorization for the unrealized Chicopee River parcel stadium. To obtain the four million dollars that was still needed for site acquisition, the City filed for two state grants, each in the amount of two million dollars. One application sought a two million dollar Community Development Action Grant (CDAG) from the Commonwealth’s Department of Housing and Community Development (hereinafter Community Development Department) and the other application requested a two million dollar Public Works Economic Development Grant (PWED) from the Commonwealth’s Department of Transportation and Construction (hereinafter Transportation Department).
General Laws Chapter 121B, §57A, provides the authority and criteria for award of CDAG grants. The applicable subsections of section 57A provide that:
(a) Any eligible city . . . may apply to the department for a grant in a specific amount to fund a specified community development project, (b) No application for a community development action grant shall be made until a public hearing relating to the proposed community development project has been held after due notice before the appropriate municipal officers of the city or town. The department shall not approve any community development project unless it shall have found that:
(1) The project area is a decadent, substandard or blighted open area.
(2) The project will be of public benefit, in the public interest and for a public purpose, consistent with the sound needs of the community as a whole, and any benefit to private entities or individuals will be indirect and incidental and not the purpose of the project.
(3) The project area would not by private enterprise alone and without either government subsidy or the exercise of governmental powers be made available for redevelopment.
(4) The amount of the grant to be provided appears to be the minimum amount necessary to make the project feasible.
(5) The project will have a significant impact on the economic condition of the city or town, including the generation or retention of long-term employment.
(6) There exist firm commitments of private or other public resources in amounts sufficient, when added to the amount of the proposed grant, to render the project financially sound.
The Department of Transportation and Construction’s governing law (St. 1981, c. 732, §1, et seq., The Transportation Bond Act), does not contain specific authorization for the Department to grant public funds to clear land for redevelopment projects unrelated to highway or transportation purposes. Regulations promulgated to carry out the Act (791 CAR: Executive Office of Transportation and Construction) establish the criteria for the application and distribution of funds under the Public Works Economic Development Program. Specifically, 701 CAR5:01 provides:
Whereas the establishment of this program is derived from the traditional state highway program authorization within the 1981 Transportation Bond Act (St. 1981 c. 732), the scope of the proposed regulations is limited to the financing of highway-related (as defined in 701 CAR 5.04) facility development.
None of the eligible projects listed under 5:04, or eligible projects that could be inferred from the language of 5:04, seems to come close to acquisition and clearance of a site for the construction of a baseball stadium, or any other edifice, that is not related to a project for the “design, construction ... or reconstruction of . . . public access roads, streets and bridges, curbings, . . . associated with a municipal economic development effort ...” Despite this, the City was *394 awarded a two million dollar PWED grant for stadium site acquisition and clearance.[12]
The City’s applications for CDAG and PWED grants were filed in June 1999, months before the draft lease was given to the City Councillors and months before most of the proposed stadium financing was structured. On August 30, 1999, a joint letter was sent to Mayor Albano by the Director of the Community Development Department, Jane Gamble, Transportation Secretary Kevin Sullivan, Mass Development Director Michael Hogan and Director Carolyn Boviard of the Massachusetts Department of Economic Development. These public officials notified Mayor Albano that all of their agencies had concerns about the project. The letter detailed these concerns and asked that the City respond. The next day, August 31, 1999, the mayor sent a several hundred page response to Director Gamble. Most of the response consisted of copies of documents that had already been submitted with the original applications. Additional documents were also submitted. Approximately ten days after the mayor’s response, the two grants were awarded to the City. The CDAG award was conditioned on the City satisfying five specific conditions. By letter of September 15, 1999, the mayor submitted a written document to Director Gamble, entitled “Satisfaction of Conditions Set Forth In . . . CDAG Grant Award.” The representations contained in the original applications, the mayor’s August 31, 1999 letter, and the mayor’s September 15, 1999 submission to Director Gamble are germane to the court’s analysis of whether the takings in question were primarily for a public purpose.
Grant Applications and City's Representations — In a letter to Director Gamble that accompanied the original June 1999 CDAG grant application, the mayor wrote that “the City will use CDAG grant funds to implement site assembly activities including acquisition and relocation that will produce a development site for the new stadium.” In the grant application, the mayor certified that the:
CDAG funds will allow the City of Springfield to acquire and assemble land for the construction of a multi-use civic stadium. The stadium will be built by Springfield Baseball Corporation, a private 501C-3 corporation, on land that will remain in City ownership. Full implementation of the project is estimated to cost $21.3 million. The City of Springfield is seeking $2 million in . . . CDAG funding in order to implement site development activities including land acquisition, relocation assistance, demolition and site preparation for the construction of a 5,500 seat stadium. Ninety-seven (97) new permanent jobs will be created as a result of this project as well as numerous indirect jobs in the Central Business District where the stadium will be located. The construction of the stadium will result in the creation of seventy-four (74) temporary construction jobs. The Civic Stadium will have a significant impact on the local economy directly benefit-ting the Central Business District including hotels and restaurants, merchants, tourism-related businesses and will generate new tax revenues for the state and city. CDAG funds are essential to meet this goal.
Several other certifications were part of the CDAG grant application, some relevant to the issues before the court. As part of the grant application, the mayor, the chairman of the City’s Planning Board and the Springfield Building Commissioner signed a document entitled “Certificate that the Project Area is Decadent, Substandard or Blighted.” In that certificate, as in the other original CDAG grant submissions, the “project site” is described as “6 acres of land in the northern portion of the Central Business District.” This description, of course, refers to the three parcels that were taken by eminent domain in September 1999. The certification does not in any manner describe the project site as decadent, substandard or blighted. Nor does it specify what it means by “Project Area,” as contained in the title of the certificate. Instead, the certificate states that the project site is located in part of the North End Urban Renewal Project.
Thereafter, the certificate refers alternatively to the North End and Memorial Square neighborhood and the “distressed condition” of that neighborhood. These references are not to the project site, but rather to an area of the City that is adjacent to the project site and is not part of the North End Urban Renewal Project. The certificate recounts that the North End/Memorial Square area is part of the 1995 federal “Enterprise Community." (The subject parcels are not part of this “enterprise community.”) The certification concludes that the “Enterprise Community designation signifies the ongoing need to overcome the negative impact caused by substandard, blighted conditions in the Main-Congress target area. The benefits created by the development of the project will have positive impacts upon the sound economic growth of the community as a whole and the Enterprise community in particular.”
In the next certification in the CDAG application, the same three city officials certify that the following economic priorities will be served by stadium construction:
Job Creation and Job Retention
Business Creation Opportunities
Investment in the Central Business District
Investment in the Enterprise Community
Investment in an Urban Renewal Area
The “Job Creation and Job Retention” representation made to Director Gamble was supported by an attached document which claimed that 97 new full and part-time jobs would be created by the stadium operation. Tax revenue potential from the jobs and *395 stadium operation was estimated at two hundred twenty-eight thousand ($228,000) dollars. This estimate included projected sales taxes, hotel taxes, meals taxes, personal income taxes and corporate taxes. Included in the total projected tax amount was forty-three thousand ($43,000) dollars categorized as “other” taxes. This certificate estimated that the stadium operation would generate “annual direct spending of two million four hundred thirty-five thousand dollars, supposedly from ticket sales, vendor spending and the like.
In support of the estimates of employment and tax revenue, the City attached the report of Conventions, Sports & Leisure International (hereinafter C.S.L.). This company specializes in stadium projects. SBC had commissioned the report, the final version of which was submitted to SBC one week before the CDAG application was filed. The C.S.L. report is con-clusory in form with little objective data offered to back up the claims made by the City in the grant application. Indeed the C.S.L. transmittal letter to SBC states that the “report is based on estimates, assumptions and other information developed from research of the market, knowledge of the sports industry and other factors, including certain information that you have provided.” The letter also states that information provided to C.S.L. by others was not audited or verified. C.S.L. further stated that it was expressing “no opinion or assurances of any kind on the achievability of any projected information contained herein.” C.S.L. instructed SBC that, “Neither the report nor its contents may be included or quoted in any offering circular or registration statement, prospectus or any other type of financing document.”
The C.S.L. report purports to estimate revenue from the proposed stadium based on a comparison with fourteen other minor league baseball stadiums constructed in the last decade and which are used by Northern League teams or Class A affiliated teams. However, thirteen of the fourteen stadiums are owned by municipalities or official redevelopment agencies. The benefits muring to the governmental owners of those thirteen stadiums are not contained in the report. Rather, the report is largely geared to what SBC can expect in revenue from the stadium. With this in mind, the stadiums that C.S.L. used as comparables had an average ball game attendance of 50% of available seats. The majority of stadium events that took place in those stadiums were baseball games. The C.S.L. job estimates were confined to newjobs created by the operation of the proposed stadium. C.S.L. did not analyze the already existing jobs that wouldbe lost because of stadium operation. Despite their own statistical analysis, C.S.L. projected average attendance per game at approximately 4,150 people, a figure significantly higher than the average for the purportedly comparable stadiums. Except for suites and box suites, the average ticket price was estimated at approximately $6.00. According to C.S.L.’s projections, SBC could expect annual “net operating income" of between six hundred seventeen thousand ($617,000) dollars and seven hundred and eighty-one thousand ($781,000) dollars before payment of debt service and capital reserve funding.
The CDAG application required certification of financing commitments. An “Agreement Letter of Firm Commitment” was signed by the mayor and by Mr Graney acting on behalf of SBC. The letter obviously did not provide the required financing commitments; instead, it simply recited that Mesirow was the underwriter for six million ($6,000,000) dollars in tax exempt bonds and other private lenders would provide four million six hundred thousand ($4,600,000) dollars in secured funds. In addition, the letter represented that a one million ($ 1,000,000) dollar donation, along with seven hundred thousand ($700,000) dollars of a broadcasting right fee and five hundred thousand ($500,000) dollars in concession rights fees would provide the balance of the financial package. As discussed earlier, there has never been even a draft of a concession rights agreement, let alone a five hundred thousand ($500,000) dollar concession rights fee.
At the same time the CDAG grant application was submitted to the state’s Community Development Department, the City submitted a PWED grant application to the state’s Transportation Department. Except for the form of the respective applications, the information submitted by the City for the PWED grant was essentially the same as for the CDAG grant.
In both grant applications, the City represented that it conducted a public hearing on the grant applications on June 4, 1999 at 4:00 p.m. The sign-in sheet for the hearing reveals that only five people attended: the mayor, Mr. Graney, a representative of the City’s planning department, a representative of SBDC and the hearings officer from the Office of Community Development.
On August 24, 1999, three City Councillors wrote to Director Gamble to comment on the proposed CDAG application. The councillors expressed their concerns about notice, or lack thereof, of the June 4, 1999 public hearing. The councillors represented that “only the barest requirement of the open meeting law was made.” They reported that the owners of the subject parcels were not notified of the meeting nor were the business tenants on those parcels. According to the councillors, there was no notification in the newspapers or other media outlets. The councillors objected to both the site and design of the stadium. They explained that the Northgate site, rather than being blighted, contained a fully occupied shopping plaza that served the needs of the neighborhood, which included elderly housing and economically disadvantaged families. In addition, the three councillors expressed their concern that the stadium would be *396 designed for use principally as a baseball stadium rather than a multi-use sports stadium.
Director Gamble's August 30, 1999 Letter and the City's Reply — As earlier referenced, on August 30, 1999, Director Gamble (Community Development), Secretary Sullivan (Transportation), Executive Director Hogan (Mass Development) and Director Boviard (Economic Development) notified Mayor Albano of significant concerns they mutually held with respect to the grant applications. These concerns and the mayor’s August 31, 1999 response, and accuracy thereof, are as follows:
1. Urban Renewal Plan — All of the signatories to the August 30 letter were of the opinion that a baseball stadium was not an eligible use under the North End Urban Renewal Plan and thus, a formal amendment to the plan must first be secured. Moreover, the officials noted that the project site was already renewed as part of the urban renewal plan and thus the City must explain why re-renewal was necessary and how under the “statutory definitions” (G.L.c. 121B, §1) the project area can continue to be blighted, open, substandard or decadent. Additionally the state officials asked the mayor to provide a cost/benefit analysis that should include the original amounts of public and private funding used to renew the area, a description of the businesses to be displaced, the types of jobs the area currently supports including payroll and benefit statistics from those jobs and finally the tax revenue the City receives from the area compared to what it will receive from the proposed stadium project.
To these concerns, the mayor responded that a “civic baseball stadium” was an eligible use in the North End Renewal Plan. In support of this statement, the mayor provided an opinion letter from the attorney for the Springfield Redevelopment Authority (hereinafter SRA), stating that under the North End Urban Renewal Plan, the uses permitted are “Special Business/Light Industrial, which were defined under the plan as ’’offices, hotels or motels and institutions." Stating that the urban renewal plan does not define “institution,” SRA’s counsel contended that reference should be made to the Comprehensive Plan for Springfield, as approved by the local planning board, wherein “institutional” means service functions having to do with health, education, government, religion, culture or similar public or private non-profit activities." Without plowing through the Comprehensive Plan for Springfield, suffice it to say that the “institutional” definition in that plan refers to activities permitted in buildings in certain areas, as opposed to actual land usage. Moreover, other economic development legislation makes it clear that institutional use is different from recreational use. G.L. Chapter 121A provides a comprehensive and detailed statutory scheme that allows private entities, including not-for-profit corporations to undertake redevelopment projects, with the oversight of the Department of Housing and Community Development. In G.L.c. 121A, §1, “project" is defined as “any undertaking consisting of the construction ... of any sanitary residential, commercial, industrial, institutional, recreational or governmental buildings. Thus the legislature has not only given clear indication in one statute that an institutional building (e.g., a hospital), is different from a recreational building, but it has done so in a statute that is targeted to encourage economic redevelopment.
But whether SRA’s attorney’s opinion is right or wrong does not make any difference. The City concedes that it was not taking the property under the Urban Renewal Act, G.L.c. 121B; rather, it was taking the property under its general eminent domain powers pursuant to G.L.c. 79. Indeed, both the mayor and Mr. Graney testified that one of the main reasons for the Citys and SBC’s joint decision to have the City acquire the property and then lease it to SBC was their clear knowledge that a formal amendment to the North End Urban Renewal Plan would have to be granted if the parcels were acquired for stadium use by an entity other than the City. If, for example, the SRA were the taking agency, the notice, hearing and finding requirements of G.L.c. 12 IB, §47, would have to be met. The reason for these requirements is that the parcels to be taken had been developed for business use as a direct result of an urban renewal plan and had been continued in that usage because of that plan; yet the proposed stadium project called for a use not contained in that urban renewal plan. But instead of simply telling Director Gamble that the City was not proceeding under the Urban Renewal Act, the mayor submitted the letter from SRA’s counsel to make it appear that the City and SBC were in full compliance with G.L. 121B and that a formal amendment to the urban renewal plan was not required.
In response to the state agencies’ questions regarding the basis for the City’s claim in the grant applications that the project area was blighted, open, substandard or decadent, the mayor adopted and attached a letter dated August 16, 1999 from SBC’s attorney, Mr. Brown, to Mass Development Executive Director Michael Hogan.
Although there was no direct evidence at trial that the agencies had raised their concerns before the joint August 30, 1999 letter, the first paragraph of Mr. Brown’s letter to Mr. Hogan refers to the fact that in July 1999, the Department of Housing and Community Development had already expressed concerns about the eligibility of the project site for inclusion in state grant funding. Mr. Brown’s letter appears to exchange freely specific statutory terms to suit the particular point he is making. While this practice might not be a problem with respect to Mr. Brown’s role as SBC’s advocate, in this instance, the mayor was specifically adopting Mr. Brown’s letter as representing the mayor’s response to the state agencies’ August 31,1999 letter. Mr. Brown specifically states the “Proj *397 ect area is the North End Urban Renewal Area.” But then he says almost everywhere else in the letter that in determining the “decadent” condition of the “project area,” the agency should consider the decadent state of the Carew-Bond-Patton and that the economic revitalization of Memorial Square and the decadent Carew-Bond-Patton blocks will be more readily met by clearing the Northgate and Dreison parcels to make way for the stadium. In what appears to be a purposeful distortion of the “project area,” Mr. Brown states that:
The Dreison Parcel and Northgate Parcel abut Interstate 291 to the North. The Stadium Site is located within and is part of the Project Area. The Project Area is located at the northern end of the City’s Central Business District. The area within the Project Area immediately north of Interstate 291 to the north of the Stadium Site bounded by Carew Street, Bond Street and Patton Street is located outside of the City’s Central Business District at the southerly boundary of the City’s North End community and includes a number of deteriorated properties. (Carew/Bond/Patton.)
Through this dizzying description, Mr. Brown and thus the mayor are saying that Carew-Bond-Patton is the decadent area within the Project Area and thus the existing Dreison and Northgate uses must be sacrificed so that professional baseball can save Carew-Bond-Patton.[13] The problem with this representation is that Carew-Bond-Patton is not in the North End Urban Renewal Plan. It is not part of the “Project Area.” What SBC and the City, through its incorporation of this letter, were trying to do was piggy-back Carew-Pond-Patton into the “Project Area” so that there was some justification to their claim that the Project Area, wherein the proposed stadium site lays, was decadent and thus an appropriate use for a Community Development Action Grant. Mr. Brown, and thus the mayor, by his adoption of Mr. Brown’s letter, do not cite any decadent area within the “Project Area,” ie., the North End Urban Renewal Area.
In what appears to be a fallback position, the Brown letter states that the very fact that the Project Area is within the North End Urban Renewal Area means that the City Planning Board’s original findings, made in the 1960s and amended in the 1970s, should be given “great weight” in accordance with the holding in Boston Edison Co. v. Boston Redevelopment Authority, 374 Mass. 37 (1977). In the 1960s it was determined that the project area was blighted open, substandard or decadent. The Dreison and Northgate parcels were thereafter put into use as sites for manufacturing and commercial businesses in order to end the blighted, substandard and decadent conditions. There is no evidence before this court that prior to the City’s and the SBC’s interference with the sites, the utilization of those sites ever failed to meet the expectations of the North End Urban Renewal Plan. The Boston Edison Co. case, supra., that Mr. Brown had cited in his letter, had nothing to do with an urban renewal area. Rather, it concerned a G.L.c. 121A private entity redevelopment project, and concurrent findings made with respect to that specific project.
In the August 30, 1999 agencies’ letter, the City was asked to provide a description of the businesses to be displaced, as well as the jobs the area supports and payroll information about those jobs. To this very important concern, the mayor responded that he was attaching a list of the businesses that -will be relocated, “but the City does not have specific job information relating to the businesses that will be relocated.” That statement was not true.
The mayor knew that the Marox Corporation was located on the Dreison site. Mr. Rosenkranz is a principal owner of Marox, as well as Dreison. Marox employed more than sixty full-time management and skilled manufacturing employees who made precision medical screws and component parts. In fact, at the mayor’s direction, the City’s planning department examined the Dreison site in 1996 and determined that the Marox business occupied a single-story 52,000 square foot building that was constructed in 1965 and was in “excellent” condition at that time. The department reported that Dreison had recently bought two adjacent parcels from the SRA. The evidence indicated that Marox intended to expand its manufacturing operation onto these parcels because its successful business was outgrowing the original building. This information was not given to the state agencies. In fact, the testimony of Mr. Graney, taken together with the mayor’s testimony about Marox corporation, strongly indicates that one reason that Dreison entered into the purchase and sale agreement with SBC was that the site was targeted for the proposed stadium and Drei-son needed time to help move the Marox operation. As the trial evidence revealed, Marox uses highly specialized machinery and tools and it was not a simple matter to pick up and move. As the mayor testified during cross-examination, there is “no question that this was a forced relocation of Marox.”
Marox has now moved to Holyoke. The mayor’s testimony regarding the reasons for the Marox move were inconsistent. At one point, he testified that he met with Mr. Rosenkranz to analyze how the City could 'help with the company’s expansion needs. At another point he testified, “they [Marox] were going to go anyway,” because the mayor of Holyoke had designated either Dreison or Marox as a preferred developer for some site in Holyoke. At yet another point, he testified that the businesses on the Dreison and Northgate parcels were “vital” to the City and there would not be a loss of local taxes from these businesses because they would relocate within the City. After saying this, he evidently recalled that Marox had already moved to Holyoke and corrected his testimony accordingly. None of the above information was con *398 tained in the City’s August 31,1999 response to the agencies’ questions about displaced businesses. The record is devoid of any evidence that the City even attempted to obtain displaced businesses’ payroll and benefit information, despite the grant agencies’ request for such information.
The absence of information regarding the potential loss of business on the Northgate parcel is even more pronounced. In the case of Northgate, the City’s response to the state agencies’ August 30, 1999 request was limited to providing a list of the fifteen businesses which were Northgate’s tenants. The City did not even attempt to officially determine the number of employees working in those businesses nor did it undertake any investigation to determine the likelihood that the businesses would remain in the city if the parcel were taken for a baseball stadium. In fact, more than two hundred people worked in full-time and part-time jobs in the businesses located at Northgate. The mayor was aware of this fact. These businesses are varied and include the Massachusetts Society for the Prevention of Cruelty to Children, a veteran’s center, a barbershop, a small grocery market, a mental health center, a consumer credit counseling service, and a liquor store. Despite repeated assertions at trial that these business tenants would relocate somewhere in the City, there is not a scintilla of evidence that such is the case.
The City did provide the tax information requested by the agency. The annual real estate tax bill for Dreison was forty-eight thousand seven hundred dollars and for Northgate, fifty-six thousand five hundred dollars.
2.Project Feasibility — The agencies informed the mayor that they must have evidence that irrevocable commitments for financing from lenders were in place before a grant award would be considered. The City responded by stating that “it would be more appropriate for DHCD to require that all such funding commitments be in place prior to the actual use of any grant money.” The reality was that the financial institutions had not, and still have not, irrevocably committed to the loans. Nonetheless, the City detailed the proposed funding scheme to the agencies and provided draft copies of proposed financing agreements. The City did provide a copy of the 1995 City Council two million dollar bond authorization.
The agencies August 31, 1999 letter stated that their independent review of the grant submissions suggested that ticket sales would average between 1000 and 1500 tickets per game and thus asked the City to provide “a more realistic pro forma and operating budget.” In response, the City corrected the agencies’ assumption that the stadium would seat 4500 people when actually the stadium would seat 5300 people. The City also submitted the C.S.L. study, referenced earlier, as well as a copy of the stadium development budget.
3. Northern League Expansion Franchise — The City provided a copy of the Northern League franchise agreement in response to the agencies’ request for details regarding the contract.
4. Job Creation — The agencies questioned the City’s estimate that the stadium would generate 97 jobs and asked the City to justify that number. Additionally, the agencies opined that approximately 90% of the jobs would be part-time. The City did not provide a response as to how it arrived at an estimate of 97 jobs. Instead, the City simply reiterated that number and represented the jobs would be “97 full-time equivalent permanent jobs.” There was no reasonable basis for this representation. The majority of jobs were for the four to five month baseball season. Even the ball players would have only seasonal jobs. The City did point out that the C.S.L. report stated that approximately thirty jobs would be part-time. In his testimony, the mayor tried to qualify the City’s prior assertions that the stadium project would provide “97 full-time equivalent permanent jobs” by explaining that the job estimate took into account people who might be employed at the stadium for events other than baseball games. Without an adequate explanation for this assertion, the mayor simply said that he “relies on people like Michael Graney for these decisions.”
Once again the City represented that these jobs would be additions to the Springfield labor market “because the businesses at the project site will relocate and the jobs will remain.” The mayor and other city officials knew this was not true. As already discussed, they knew all of the Marox jobs were lost to Holyoke and they had no idea where the Northgate tenants were headed.
5. CDAG Program Issues — The agencies raised several questions regarding the adequacy of the City’s compliance with CDAG requirements, including the adequacy of public hearings on the grant application; whether the City’s displacement of 16 businesses in favor of a long term lease to a single not-for-profit corporation indicates a direct private benefit from grant funds rather than an incidental private benefit; whether the project was for a public purpose; and how the stadium would improve the fiscal condition of the community, including job creation.
The mayor responded that the June 4, 1999 hearing on the CDAG and PWED applications met the requirements of G.L.c. 39, §23B, the state’s open meeting law. He did not provide information regarding how the meeting was advertised. In fact, the evidence established that except for posting the notice on a City Hall bulletin board, no other type of notice was given. However, the mayor in his response to the agencies did inform them that the Councillor conducted three public hearings relating to the stadium and the Council’s Finance Committee conducted two additional hearings with one more scheduled. On the public owner *399 ship issue, the mayor incorrectly contended that SBC was not a “private entity” because of its not-for-profit status. He maintained this same assertion at trial. He also claimed that the stadium was really publicly owned because the title to it would vest in the City after a “very short” lease term of twenty-five to fifty years. On the issue of community impact, the mayor referred to the C.S.L. report as well as to a previous summary of the City’s central business district economic development strategy. In response to the question about jobs, the mayor offered no further information.
The agencies told the mayor that CDAG funds are eligible for acquisition and relocation within an Urban Renewal Area only provided that the project is anticipated in the Urban Renewal Plan and the land acquired remains publicly held. Otherwise, an amendment to the urban renewal plan would be necessary and the City would have to justify why the area was blighted, open substandard or decadent. The mayor replied that G.L.c., 121B, §§1 and 57A, did not require that relocation be within the urban renewal area.
6. PWED Program Issues — This section of the agencies’ August 30, 1999 letter asked essentially some the same questions addressed earlier in the letter; namely: 1. The land to be acquired and the financing for same, 2. Why demolition of the buildings was necessary; 3. Infrastructure improvements; and 4. The process used to solicit public comment about the grant application. The mayor’s response referenced his earlier answers to essentially the same questions.
Award of Grants — On September 10, 1999, the City was notified that the Commonwealth, through the. designated agencies, was awarding the PWED and CDAG grants of two million dollars each to the City for acquisition and clearance of the stadium project site. The CDAG award was conditioned on the City providing evidence of property appraisals and environmental site assessments. It was also conditioned on the City providing copies of irrevocable commitments from all lenders and equity contributors and the City providing a final detailed budget which reflected that the City’s direct two million ($2,000,000) dollar contribution would be paid before expenditure of CDAG funds. The City provided some of this information. The lenders’ commitments were not irrevocable, but conditioned on the occurrence of a number of events. The grant award was also dependent on the Department of Housing and Community Development’s approval of the final lease between the City and SBC, as well as approval of SBC’s bylaws. According to Mr. Brown, the Councillor reviewed and informally approved the terms of the final proposed draft lease. It is not clear whether this occurred during a council committee meeting or during the meeting that ended with the enactment of the taking orders.
The CDAG grant was also conditioned on the City setting forth “in detail the facts set out in the letter of [Mr.] Brown to [Mr.] Hogan establishing that the project area is a ‘decadent area’ as defined in G.L.c. 121B, §1, together with any other facts relevant to this finding.” The Director required that the City include documentation of “specific facts with respect to the condition of the Stadium Site.” In response to this condition, the City provided Director Gamble with a “Certificate that the Project Area is Decadent, Substandard or Blighted.” The certificate was signed by the mayor, the Chairman of the Springfield Planning Board and the Building Commissioner. In addition to containing the Carew-Bond-Patton justification, already discussed, the City now claimed that the Drei-son parcel was obsolete and thus decadent within the meaning of G.L.c. 121 B, §1. Essentially, the certificate said that the Marox Corporation’s manufacturing business was so successful it had outgrown the building on the Dreison site. There was no information in the certificate that the building itself was obsolete or in disrepair or deteriorated condition. In fact, the evidence is to the contrary. At trial, the mayor was unable to justify the City’s finding that the manufacturing building on the Dreison property was “obsolete.”
The Cify’s supplementary material was furnished to Director Gamble on September 20, 1999. Later that same day, the Director gave written notification to the mayor that:
It appears that the Marox site of 2.44 acres is decadent and eligible for funding for site acquisition, and/or clearance, and/or preparation with a Community Development Action Grant, for which we have previously sent you an award letter.
The City Council’s votes on the proposed takings were scheduled for September 22, 1999. A day or two before that vote, Mr. Graney contacted Fleet Bank, the institutional representative of the mezzanine lenders, concerning whether the mezzanine lenders would subordinate their secondary secured priority status to the City’s rights for payment in lieu of taxes under the proposed ground lease. Fleet Bank informed Mr. Graney on September 21, 1999 that:
. . . based upon our familiarity With the terms and conditions applicable to the Loans and our familiarity with the proposed construction and operation of the Stadium, we believe that the Lenders would not make the Loans if the Tax Payment had priority over the payment of principal and interest with respect to the Loans.
On September 22, 1999, the City Council passed an order, with the approval of the mayor, accepting the CDAG and PWED grants and, pursuant to G.L.c. 44, §53A, authorized the expenditure of the grant funds for the purposes outlined in the grants.
*400 At that same Councillor meeting, the City Council voted to take by eminent domain the Northgate parcel (Parcel #1), the Conefam parcel (Parcel #2) and the Dreison parcel (Parcel #3). Each of the three taking orders stated that the eminent domain takings were “for municipal purposes.” Immediately following the Council vote, the mayor approved the takings. The following day, September 23, 1999, the orders of taking were recorded in the Hampden Registry of Deeds. SBC had hired and paid for the appraisals upon which the City Council relied in setting the pro tanto damages.
On September 29, 1999, the City Clerk sent notice of the takings to the owners of the parcels. On October 8, 1999, Dreison, through its attorney, made demand on the City for payment of the one million six hundred thirty-seven thousand five hundred dollars of pro tanto damages awarded in the taking order for the Dreison parcel.
On October 12, 1999, four hundred fifty-four referendum petitions, containing fourteen thousand nine hundred and forty-seven signatures protesting the taking orders were filed with the City Clerk. (See G.L.c. 43, §42, Local Referendum Law.) The next day, October 13, 1999, the City Clerk transmitted the referendum petitions to the Springfield Election Commission for signature certification. (See G.L.c. 43, §38, for procedural requirements.) The Election Commission certified that eleven thousand twenty signatures were valid; that number of signatures equals 13.52% of the City’s registered voters. G.L.c. 43, §42, requires that if a referendum petition is signed by at least 12% of the City’s voters, then the Councillor shall immediately reconsider “such measure” and if the measure is not rescinded within twenty days after certification of the signatures, the city clerk must submit the measure to a vote of the registered voters. On October 22, 1999 Northgate, through its attorney, made demand upon the city to cease and desist from taking any further action to implement the taking order for the Northgate parcel. In its demand, Northgate challenged the validity of the taking and pendency of the referendum petition.
Thereafter, the consolidated cases now before the court were commenced.
DISCUSSION OF THE LAW Eminent Domain
The City of Springfield is a municipal corporation with a Plan A form of government wherein the mayor is the chief executive officer of the City and the legislative powers of the City are vested in the nine-member City Council. G.L.c. 43, §48 & §50. Pursuant to the provisions of G.L.c. 43, §30, the City is authorized to take private property by eminent domain:
At the request of any department, and with the approval of the mayor and Councillor under Plan A . . . the Councillor may, in the name of the City, purchase, or take by eminent domain, under chapter seventy-nine, any land within its limits for any municipal purpose . . .
It is a fundamental principle of law that the government can only exercise its eminent domain powers for a public purpose. Benevolent and Protective Order of Elks, Lodge No. 65 v. Planning Bd. of Lawrence, 403 Mass. 531, 539 (1988); McLean v. Boston, 511 Mass. 118, 121 (1951); Machado v. Board of Public Works of Arlington, 321 Mass. 101, 103 (1947); Opinion of the Justices, 297 Mass. 567, 571 (1937). “The power of eminent domain is one of the highest powers of government. It appropriates to a public use private property against the will of the owner.” Byfield v. City of Newton, 247 Mass. 46, 57 (1923). Constitutional principles require that governmental condemnation of land must be for a public purpose and just compensation must be paid to the owner for the land. U.S. Const. Amend. V and amend. XIV and art. 10 of the Massachusetts Declaration Rights.
When land is taken for an actual public use, the constitutional public purpose for the taking is easily defined. Thus takings for purposes such as schools, hospitals, municipal buildings, fire and police departments are easily recognized as takings for public purposes. See Sellors v. Town of Concord, 329 Mass. 259, 260-62 (1952) (police and fire station and building for public meetings); Broderick v. Department of Mental Diseases, 263 Mass. 124, 128 (1928) (state hospital); Byfield v. Newton, supra at 51, 59 (schoolhouse).
Indeed, into the early 1900s, Massachusetts courts adhered to a narrow definition of public use. The exercise of eminent domain power was not permitted if it would result in a direct benefit to individuals or businesses, regardless of the general advantage that would mure to the public on account of the proposed takings. See Salisbury Land & Imp. Co. v. Commonwealth, 215 Mass. 371, 376 (1913), and Opinion 61 of the Justices, 204 Mass. 607, 611 (1910). However by the 1930s, the courts appeared more willing to recognize that the legitimate exercise of the police power was not rendered invalid simply because derivative benefits might flow to individuals. The focus of judicial review in eminent domain disputes began to turn more often to an analysis of whether the public taking primarily, rather than exclusively, benefitted the public. In Allydonn Realty Corp. v. Holyoke Housing Authority, 304 Mass. 288, 297 (1939), the Supreme Judicial Court upheld the constitutionality of the Massachusetts Housing Law, G.L.c. 121, §261 to 2611, as amended by St. 1938, c. 484.[14] This statute represented a sweeping departure from the traditional concepts of governmental duties and powers. United States Housing Act of 1937, 42 U.S.C.A., §1401 etseq. In recognition of the desperaté need of low income families to find decent and safe housing, the Massachusetts Legislature enacted a statutory scheme that gave cities’ and towns’ governments sweeping power *401 to establish local housing authorities for the purposes of acquiring land through eminent domain, clearing slums and building safe and sanitary housing. The Act, St. 1938, c. 484, set forth the public purpose for governmental acquisition of property for use as private dwellings:
. . . substandard areas exist in certain portions of the Commonwealth; there is not an adequate supply of low rent housing for families of low income within a reasonable distance of the principal centers of employment; that this situation tends to cause an increase and spread of disease and crime and constitutes a menace to the health, safety, morals, welfare and comfort of the inhabitants of the commonwealth and is detrimental to the property values therein.
The Court in Allydonn enunciated the standard for balancing public use versus private interest:
Each case must be decided with reference to the object sought to be accomplished and to the degree and manner in which that object affects the public welfare. Frequently if an object presents a double aspect in that it may in some respects result in conferring a benefit upon the public and in other respects it may result in conferring a benefit upon or in paying money to private individuals. In such instances the cases tend to distinguish between those results which are primary and those which are secondary or incidental and to classify the object according to its primary consequences and effects. At any rate it is plain that an expenditure is not necessarily barred because individuals as such may profit, nor is it necessarily valid because of incidental benefit to the public."
Id. at 292-93. In Paladin v. Somerville, 331 Mass. 627 (1954), the Court reviewed other provisions of the same housing authority law that was considered in Allydonn Realty Corp., supra. In 1946, the Legislature amended Chapter 121, §§26JJ to 26MM, to allow housing authorities to sell to private parties land which the housing authority had cleared of slums. In Paladin v. Somerville, 331 Mass. 627 (1954), the Supreme Judicial Court considered a taxpayers’ claim that the amendment authorized the housing authority to exercise its eminent domain powers to benefit private buyers of the cleared land. Id. at 631. After reviewing the statute, the Court held that the main purpose of the housing authority law was slum clearance and the subsequent sale of the cleared land was incidental to that purpose. “Once the public purpose contemplated by the statute has been achieved the authority is not obliged to retain the cleared land as unproductive property.” Id. at 632.
Judicial recognition that public purpose develops in accordance with the needs of society is hardly a novel concept. In 1899, when considering a question of the propriety of certain public expenditures, the Supreme Judicial Court stated that there is not a precise line that can be drawn between private and public uses. Attorney General v. Williams, 174 Mass. 476, 479 (1899). The exercise of the police power requires “a degree of elasticity to be capable of meeting new conditions and improvements and the ever increasing necessities of society.” Id. See John Donnell & Sons, Inc. v. Outdoor Advertising Bd., 369 Mass. 206, 218 (1975), where in upholding Brookline’s ban on billboard advertising, the Court said, “We live in a changing world where the law must respond to the demands of a modern society . . . [While the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation.” In the years following the decision in Paladin, supra, the Legislature continued to broaden the concept of public purpose, as the needs of society changed and expanded. The Supreme Judicial Court responded in kind. See Ovarian v. Mayor of Springfield, 354 Mass. 439, 442 (1968), and Sellors v. Town of Concord, supra.

Statutory Authorization Required

In a series of cases addressing the public purpose aspects of urban renewal laws enacted during the last half-century, the Supreme Judicial Court has generally held that public-private partnerships designed to promote economic revitalization of blighted, decadent and substandard areas meet public purpose requirements when the legislation that gave rise to those partnerships provided appropriate controls and oversight to protect the primacy of the public interest. See: Opinion of the Justices, 341 Mass. 760, 778-80 (1960) (holding that amendments to the urban redevelopment corporation law, G.L.c. 121A, which expanded the definition of eligible project areas and eligible uses within those areas and provided tax exempt status for private redevelopment corporations, did not violate the public purpose requirement in light of the prescribed standards set out in the statute and the regulatory controls derived therefrom); Dodge v. The Prudential Inc. Co. of America, Mass. 375, 383-84 (1961) (upholding tax concession granted to urban redevelopment corporations under G.L.c. 121A even though cleared slum area was to be redeveloped with non-residential buildings); Shriners’ Hosp. For Crippled Children v. Boston Redevelopment Authy., 4 Mass.App.Ct. 551, 556 (1976) (holding that a G.L.c. 121A project for construction of elderly housing comported with the statute since it “serves a public purpose and is designed to fulfill a demonstrated need”); Boston Edison Company v. Boston Redevelopment Authority, 374 Mass. 37, 62 (1977) (construction of a power plant in a decadent area to service hospitals and other educational and charitable institutional uses constituted a “public use benefit” under G.L.c. 121A); Benevolent & Protective Order of Elks v. Planning Board of Lawrence, supra (eminent domain taking under G.L.c. 121B was for a public purpose, despite derivative benefit to *402 Emerson College); and Cumberland Farms, Inc. v. Montague Economic Development and Industrial Corporation, 38 Mass.App.Ct. 615, 616 (1995) (“Under G.L.c. 121C, §3, a . . . municipality may organize an economic development corporation and industrial corporation to formulate an economic development plan, define economic development areas and undertake economic development projects.”). The consistent theme that runs throughout these cases is the appellate courts’ recognition that in the area of urban renewal and economic development projects, public purpose and the interests of private enterprise necessarily coincide. The primacy of the public purpose is found within the enabling laws and is protected by the controls and oversight provisions contained in the respective statutes.
Similar statutory controls are required in other governmental undertakings when it is apparent that the public purpose will invariably combine with private interests. See Massachusetts Bay Transportation Authority v. Boston Safe Deposit and Trust Company, 348 Mass. 538, 544 (1965) (holding that the statute granting extensive powers in respect to mass transportation facilities provided adequate standards to protect the primacy of the public’s need for mass transportation; “(t]he manifest objects of the enabling act and of the by-law furnish in themselves a large measure of guidance . . .”), citing Building Commr. of Medford v. C.&H. Co., 319 Mass. 273, 281-82 (1946). See also Opinion of the Justices, 330 Mass. 713, 723-24 (1953) (statute authorizing Massachusetts Turnpike Authority to lease rest area land for service stations and restaurants was constitutional since highway rest areas served a predominantly public purpose and available private services at rest areas were consistent with and subordinate to the public purpose); Village on the Hill, Inc. v. Massachusetts Turnpike Auth., 348 Mass. 107, 116 (1964) (Massachusetts Turnpike Authority has authority to take property to provide access to dump).
In Boston v. Merchants National Bank of Boston, 338 Mass. 245 (1958), the Supreme Judicial Court considered whether proposed occasional private use of a municipal auditorium violated “the undoubted principle of constitutional law that money raised by taxation can be used only for public purposes and not for the advantage of private individuals.” Id. at 248. The case arose from the implementation of Statute 1954, c. 164, which authorized the City of Boston to construct and operate a municipal auditorium with exhibition and assembly halls “suitable for exhibitions, conventions and other shows and gatherings in [Boston].” By city ordinance, a commission was created to oversee construction of a municipal auditorium. The commission voted to purchase a site containing the Mechanics Building, which was owned by a charitable corporation. The building was used historically for conventions, exhibitions, shows and the like. In order to build the new municipal auditorium on the site, the Mechanics Building had to be demolished. In recognition of the historic use of the Mechanics Building, the commission instructed its architects to design an auditorium that was not only suitable for the purposes contained within the enabling act, “but also for rental for congresses and conventions of national and regional organizations of public officials as well as . . . for rental for privately sponsored exhibitions and shows commonly resorted to by the public for education or recreation.” Id. at 247-48. Merchants National Bank was financing the construction of the auditorium through the purchase of temporary notes of the city. Because of the commission’s instructions to its architects, the bank refused to complete the financing on the grounds that the enabling statute could be construed to allow the auditorium to be used for the advantage of private individuals rather than for public purposes, thus imperiling the validity of the notes. In reviewing the expanded proposed uses for the auditorium, the Court held that a convention site “is of important value in promoting the public interests of a large city, a public advantage which is not swallowed up because conventions may also be of incidental benefit to private citizens.” Id. at 248-49. Thus,"[if] a sound financial scheme embraces facilities which tend to make possible a more nearly full time use, it is not to be presumed that dominant purpose ceases to be public and becomes private. The presumption is the other way." Id. at 249.
Against this background, the court must determine whether the City had the legal authority to take the subject parcels for the proposed ballpark through use of its general powers of eminent domain. In Opinions of the Justices, 356 Mass. 775 (1969), the Court responded to a request by the House of Representatives for an opinion regarding the constitutionality of a complex bill pending before the General Court. The proposed bill, House No. 5486, provided for “the financing, construction, maintenance, repair and operation by the Massachusetts Turnpike Authority of certain public facilities consisting of a stadium complex, a third vehicular tunnel, the Worcester toll road and an arena.” The Legislature asked the Court to answer a multitude of questions with respect to the proposed bill, the majority of which did not relate to the proposed stadium complex and arena. This court’s analysis is therefore limited to that portion of the justices’s response that concerns the stadium complex and arena section of the proposed bill. Opinions of the Justices, supra at 795-800.
The proposed bill stated that there was an acute need for a large multi-purpose stadium to be located in Boston that would be open and available to a large number of citizens. The stated purpose of the stadium was to provide facilities for public activities including political and patriotic rallies, public exercises, conventions, forums for educational addresses, cultural events and recreational activities, “including shows, expositions and professional and amateur athletic *403 events.” Id. at 779. The bill also provided that the stadium, as well as other facilities, “will promote the economic development of the commonwealth and enhance the prosperity, health, culture and welfare of its inhabitants.” Id. 779-80. Under the terms of the proposed bill, the Massachusetts Turnpike Authority (hereinafter Authority) was authorized to issue bonds to finance the construction of the stadium and other facilities. Id. at 780. Additionally, the Authority would manage the stadium “without regard to any . . . laws or regulations of any . . . political subdivision of the Commonwealth.” Id. at 781. The Authority would have the power to grant concessions and enter into operating agreements and leases. The proposed legislation required approval by the governor of any lease or grant of a concession that was in excess of one year. Id. at 782.
With respect to the stadium portion of the proposed bill, the Legislature asked whether “any proper public purpose will be served by the stadium complex ... by the use of public funds or with the assistance of various advantages (e.g., tax exemption and the power to acquire by eminent domain).” Id. at 795.[15] The justices responded that governmental acquisition of land and the financing and construction of a sports stadium may be considered a valid public purpose “if the expenditure of public funds, the extension of public privileges, powers and exemptions, and the use, rental, and operation of the projects are adequately governed by appropriate standards and principles set out in the legislation.” Id. The Court informed the Legislature that the proposed bill did not contain adequate statutory standards to protect the public interest. However, the justices stated if the pending bill were revised “to include such statutory principles and standards as will make the construction and operation of the stadium and the arena for a proper public purpose, we are of the opinion that the Authority may be granted both power to take land by eminent domain and tax exemption.” Id. at 800.
Dreison and the City contend that the Opinions of the Justices does not apply to the City. See also Burnham v. Mayor and Aldermen of Beverly, 309 Mass. 388, 389 (1941). Springfield is a municipality and as such has “broad power to take land within its limits by eminent domain for any municipal purpose.” Poremba v. Springfield, 354 Mass. 432, 437 n.4 (1968).
In their arguments, Dreison and the City suggest that in Opinions of the Justices, 356 Mass. 775, the Supreme Judicial Court’s analysis of the acquisition and operation of a stadium as a public purpose was limited to the narrow statutory powers of the Authority.[16] That argument is not supported by the plain language of the decision. In responding to the Legislature, the justices observed that the stadiums, like the one proposed in the legislation, are designed for use by private entities as well as the public. For that reason, legislative standards are necessary to protect against private interests superseding the interests of the public in a facility that is funded, at least in part, by a substantial amount of public dollars. Id. at 796. The court contrasts that type of mixed usage with direct public uses such as highways and schools. Id. at 796. Clearly, the Opinions of the Justices is applicable to all governmental entities and public corporations. On the other hand, the opinion should not be over-read. The Court was not saying that a municipality cannot exercise its general powers of eminent domain to acquire land for a ballpark or to build a ballpark to be used primarily by the public for events such as high school baseball games, little league games, public gatherings and the like. Incidental uses by private entities, including for profit corporations, would not taint the inherent public nature of such a facility. See Everett v. Metropolitan District Commission, 350 Mass. 575, 579-80 (1966) (authorization for construction of concession booths subordinate to public purpose of stadium found valid).
Instead, the Court recognized that where it is contemplated that a stadium will be used primarily or substantially by a privately owned professional athletic team, statutory controls must be in place before public funds can be used to acquire or build such a stadium. That is exactly the type of stadium at issue here. The principal immediate reason for the proposed stadium in this case is to allow a private not-for-profit corporation to own and operate a professional baseball team. As reflected in the history leading up to the takings in this case, including the proposed lease terms and the design of the proposed stadium,[17] the ultimate goal is to secure at least a class AA affiliation. The arrangement between the City and SBC does not prohibit SBC from assigning the lease to persons or entities operating a team for profit. Under the lease terms as currently proposed, such profit-making enterprises would not owe the Ciiy a dime in rent for the duration of the lease. That type of potential private windfall is precisely what concerned the justices. Id. at 798.
In addition to owning the team, SBC or its assignee can assess fees for civic uses of the stadium by anyone other than the City itself. All civic functions must give way to the professional baseball team’s use of the stadium. Other than knowing the length of the baseball season, there is nothing in place or proposed that defines the extent of that use. The justices stated that statutory standards must be designed “to protect whatever public interest there may be in having the facilities available to a diversity of users on a fair basis, and not, for example, placed so exclusively at the disposal of one or more particular users that an equitable amount of use by others will be unduly restricted.” Id. at 798.
Before six million dollars of public money can be spent to acquire land for the principal and immediate purpose ofbenefittmg a not-for-profit corporation, and *404 potentially to benefit a profit-making enterprise, legislative standards and principles must be in place “to protect all aspects of the public interest and ... to guard against improper diversion of public funds and privileges for the benefit of private persons and entities.” Id. at 796-97.
The City urges this court to consider and adopt extra-jurisdictional cases that upheld public financing of stadiums or acquisition of stadium sites for use by privately owned professional athletic teams. These cases are of little or no assistance to the City, since in almost all of them specific legislation existed that set standards and principles to regulate the particular governmental entity’s involvement in stadium acquisition and construction. See King County v. Taxpayers of King County, 133 Wash.2d 584, 949 P.2d 1260, 1263 (1997), wherein the Supreme Court of Washington rejected a challenge, based on state constitutional grounds, to a stadium financing statute (Laws of 1995, 3rd Sp. Sess., ch 1, Stadium Act). The Stadium Act established complex financial requirements and tax authorizations enabling Metropolitan King County to create a public authority for the creation of the Washington State Major League Baseball Stadium Public Facilities District. Through a county ordinance enacted pursuant to the statute, the authority was authorized to finance the Seattle Mariners baseball stadium. In Libertarian Party of Wisconsin v. State, 199 Wis.2d 790, 546 N.W.2d 424 (1996), the petitioners challenged the Wisconsin Stadium Act, 1995 Wis.Act 56, which authorized the formation of local professional baseball park districts that are empowered to build and maintain professional baseball park facilities. One of the park districts had contracted with the owners of the Milwaukee Brewers for joint construction of a baseball stadium. The Supreme Court of Wisconsin rejected the petitioners’ claim that the statute violated Wisconsin’s constitution by, inter alia, acquiring state debt without a public purpose and creating a private tax law. The Wisconsin court held that the public purposes enunciated in the statute (providing recreation, encouraging economic development and tourism, reducing unemployment and, bringing capital to the state for benefit and welfare of the citizens) were adequately protected by the statutory standards governing the operation of the park districts and by providing stringent financial controls over the use of public funds for stadium land acquisition and construction. In Lifteau v. Metropolitan Sports Fac. Com’n, 270 N.W. 749, 751 (Minn. 1978), the Supreme Court of Minnesota vacated a lower court’s order that enjoined implementation of the Metropolitan Sports Facilities Act, L. 1977, c. 89, which established elaborate governmental oversight requirements for governmental participation in stadium site acquisition and construction. The dispute arose in anticipation of a revenue bond issue that would partially finance reconstruction of Metropolitan Stadium which was home to the Minnesota Twins baseball team, the Minnesota Vikings football team and the Minnesota Kicks soccer team. The stadium was also used for high school championship games and charity sports events. In holding that the statute complied with the state’s constitution, the Court found that the legislation provided adequate controls to protect the public interest in recreational and athletic activities and provided extensive conditions which must be met before bonds can issue. Id. at 357. See also Bazell v. City of Cincinnati, 13 Ohio St.2d 63, 233 N.E.2d 864 (1968) (upholding a cooperative agreement between a county and the City of Cincinnati to construct jointly a baseball stadium on land already owned by the City, for the use of the Cincinnati Reds baseball team, where cooperative agreement was authorized by state statute, Section 153.61 Revised Code of Ohio); New Jersey Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 292 A.2d 545 (1972) (upholding the constitutionality of the New Jersey Sports and Expansion Authority Law, L. 1971, c. 137, N.J. S.A. 5:10-1 et seq. that established a public authority to “bring about” construction, operation and maintenance of a sports complex in the Hackensack meadowlands).
Indeed the City has provided the court with only a few cases that have recognized the inherent power of a municipality to acquire or construct stadiums for the principal use of private athletic franchises. Two of these cases, Martin v. Philadelphia, 420 Pa. 14 (1966), and Conrad v. Pittsburgh, 421 Pa. 492 (1967), were cited by the Court in Opinions of the Justices, supra, 356 Mass. at 795, and not adopted by the Court. In Ginsberg v. City and County of Denver, 164 Colo. 572, 436 P.2d 685 (1968), the Supreme Court of Colorado held that the city and county had inherent power to accept a gift of the Bears Stadium from a not-for-profit corporation. In addition, the court determined that the city could issue “net revenue bonds” to enlarge and improve the stadium and lease it to Empire Sports, the owner of both the Denver Broncos football team and the Denver Bears, a Pacific League baseball team. Id. at 690. The court in Ginsberg stated that the modem trend was “to expand and liberally construe the term public purpose.” Id. at 688. The court noted that Denver’s elected representatives had approved the specific terms of the land transfer and lease agreements which contained appropriate provisions for rents and use fees that were sufficient to protect Denver’s interests. The court found it was significant that the city’s ownership was acquired by gift. Id. at 689.
it is a matter of common knowledge that most large cities in this country have constructed or planned for the construction of large sports stadiums. This court should not nullify the action of the City, which appears to be in tune with the trend of the times. This is particularly true where, as here, such a facility can be acquired by the City as a gift involving the creation of no debt or expenditure of general revenue of the City.
*405 In the case at bar, the City will expend both general revenue and state grant money to acquire the stadium parcel. It will not receive rent from the lessee nor will it receive portion of fees paid to SBC by third-party users.
The City also relies on City of Oakland v. Oakland Raiders, 183 Cal.Rptr. 673, 646 P.2d 835 (1982), to support its position that state legislation is not required. The facts of that case are dramatically different from those before this court. In the Oakland Raiders case, the City of Oakland took by eminent domain the business franchise that owned the Oakland Raiders football team. The California Supreme Court held that a municipality could take a business by eminent domain and operate it. The facts in the Oakland Raiders case are not parallel to this case. Should the City of Boston ever decide to take the Boston Red Sox franchise by eminent domain and without specific statutory authorization, then we will know whether Massachusetts law corresponds with California law on that issue.
General Laws, c. 44, §7(25) authorizes a city to incur debt: “For the construction of municipal outdoor recreational facilities and athletic facilities, including the acquisition and development of land and the reconstruction of facilities . . .” Subsection (25) was added to §7 in 1977. Dreison and the City claim that the Legislature’s express grant of authority authorizing cities to borrow money for the construction of athletic facilities, in effect, negates the Opinions of the Justices, supra, 356 Mass. at 795. Dreison offers this explanation: “because every express grant of authority carries with it all implied powers necessary to carry out the legislative charge . . . , and cities have the general power of eminent domain under G.L. 43, §30, cities may take private land by eminent domain for a public athletic facility.” The simple reply to that assertion is that such authority was granted to Massachusetts cities about one hundred years ago. General Laws c. 45, §14, specifically authorizes cities “to acquire land and buildings ... by gift, purchase or by eminent domain under chapter seventy-nine, ... for the purposes of a public ground or recreation centre, and may conduct and promote recreation, play, sport and physical education, for which admission may be charged, . . . and may construct buildings on land owned or leased by it . . .” In Opinions of the Justices, supra, the answers provided to the Legislature were based on constitutional principles. The justices told the Legislature that the stadium sections of the proposed bill were constitutionally defective, essentially because the relevant portions of the bill did not adequately protect the public interest. Neither the City nor Dreison offers any support for the proposition that G.L.c. 44, §75, were enacted in response to the Opinions of the Justices. Even if it were, it would not make any difference. Statutes cannot overrule the state or federal constitution.
The City states that the holding in Ballantine v. Falmouth, 363 Mass. 760 (1973), decided after Opinions of the Justices, supra, supports its position that legislation detailing the terms of a lease between a city and a private party is not required. Without question, a city has the power to lease its property to a third person in order to carry out a public purpose. The fact that the lessee will receive a benefit from the lease is incidental to the fulfillment of the public purpose. In Ballantine, the Town of Falmouth acquired property by eminent domain and then leased the land to a private parking lot operator. The purpose of the taking was for off-street public parking, unquestionably a public purpose. The Court held: “The need for parking for the public ... is unquestioned. A taking of premises for municipal parking is not to be invalidated merely because some private benefit may follow.” Id. at 764. In contrast, when a city exercises its power of eminent domain for the primary purpose of granting a leasehold estate to a private entity so that the entity can build a stadium for its baseball team, the public purpose is not clear. Legislation governing the relationship of the governmental entity and the lessee is necessary in order to define the public purpose:
The provision of such facilities ... is not as clearly and directly a public purpose as supplying housing, slum clearance, mass transportation, highways and vehicular tunnels, educational facilities, and other necessities. As to such essential enterprises, the public objectives are well understood. The appropriate and usual methods of achieving them also, on the whole, are well established. In such cases, somewhat general standards of public convenience and necessity and principles of prudent, frugal government administration, necessarily to be implied from the essential projects themselves, may adequately guide the expenditure of public funds, even where there may be involved arrangements with private persons or entities operating for profit.
Opinions of the Justices, 356 Mass. at 795-96.
Bad Faith
Even if legislation establishing standards for the City’s proposed participation in the stadium project were not required, the takings must still be set aside. The evidence clearly and convincingly establishes that the City acted in bad faith when it exercised the power of eminent domain to acquire title to the Northgate, Conefam, and Dreison parcels. This decision is not reached lightly. The court is well aware that a governmental entity, in exercising the power of eminent domain through its elected representatives, is presumed to be acting from proper motives. “It is taken for granted that conduct of public officers ... is according to law unless the contrary is made to appear.” Nevins v. Councillor of Springfield, 227 Mass. 538, 541 (1917). Great deference is accorded to the taking authority and its determination of public purpose. See, Boston v. Talbot, 206 Mass. 82, 90 (1910). *406 In Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 242-43 (1984), the United States Supreme Court stated, with respect to a federal taking, that when the Legislature’s “purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings — no less than debates over the wisdom of other kinds of socioeconomic legislation — are not to be carried out in . . . the courts.”
But when the evidence overwhelmingly demonstrates that the dominant reasons for a taking is to benefit private interests or to use the power of eminent domain for improper reasons, then the taking is invalid. See Pheasant Ridge Associates Limited Partnership v. Burlington, 399 Mass 771, 776 (1987).
It is critical to note that there is scant evidence regarding the Councillor’s involvement in the decisions and strategy that led up to the taking votes. However, the record is clear that the proposed draft lease was presented to the councillors weeks before the taking votes. That document reflects the City’s understanding of the primary objectives that would be accomplished by these takings. Although it is not executed, the credible evidence establishes beyond any question that the draft lease reflects the intent of the councillors who voted in favor of the taking and the intent of the mayor who approved the takings. Northgate’s counsel hit the nail on the head when he commented that the draft lease “is all we have” in divining the reason for the Council’s passage of the taking orders. The orders do not reveal the purpose of the takings; each simply states the taking is for “municipal purposes.” Thus, the Council did not even comply with the basic requirement of G.L.c. 79, §1 that the order of taking “shall state the purpose for which such property is taken.” The law requires that the purpose must be stated so that the intent of the taking authority is known. “The natural meaning of the requirement that the order of taking shall state the purpose for which such property is taken is that some definite use must be declared as the intent and design of the body exercising the power, and that a general, undefined and comprehensive statement will not satisfy the terms of the statute.” Byfield v. Newton, supra, 247 Mass. at 57. The purpose of the takings at issue here was well known and thus deviation from the statutory requirement is not fatal. However, in light of the other events and contingencies surrounding these takings, the lack of compliance with one of the most basic requirements of the eminent domain law gives the court pause. Without a definite statement of purpose, the condemned property can more easily be diverted to other uses. Byfield, supra.
The court’s decision that the City acted in bad faith in taking these parcels is based in large measure on the actions and representations of the mayor in the events giving rise to the takings. His intent is of consequence, since property cannot be taken without his approval (G.L. 43, §30). The actions, words and knowledge of the mayor, acting within his authority, are attributable to the City. Pheasant Ridge Associates Limited Partnership v. Burlington, 399 Mass. 771, 777 (1987). The facts leading up to the takings are detailed earlier in this memorandum.
They demonstrate that until sometime in 1997, city officials were primarily motivated by the public interest in their efforts to attract professional baseball to Springfield. The 1995 two million dollar bond authorization was voted in expectation that the state, through statute, would provide the lion’s share of stadium construction costs. Until sometime in 1996, the Chicopee parcel was the preferred site. The City already owned a significant portion of that parcel and was working in harmony with the other owner. Disruption of businesses and loss of employment was not a risk. Municipal interference with urban renewal zone uses and evasion of urban renewal requirements were not contemplated. Albano’s 1996 decision that Springfield’s interests would be better served if the stadium was located in proximity to the central business district was well within his prerogative as the City’s chief executive officer. As the duly elected representative of the local citizens, he made a decision that professional baseball would enhance the economic vitality of Springfield, especially the downtown area. The mayor developed a coherent plan for the central business district that was targeted at maintaining the traditional professional business and other uses in downtown while at the same time expanding tourist, entertainment, cultural and athletic uses, within the same area. Such expanded uses would serve many tangible public goals, including providing family-oriented activities, increasing business for the hotel, restaurant and cafe trades, and providing increased opportunities for employment. The mayor’s plan also took into account that revitalization of the central business district would increase public pride and spirit. All of these goals, tangible and intangible, fit comfortably within the meaning of public purpose. See Berman v. Parker, 348 U.S. 26, 33 (1954).
However, as the City faced one roadblock after another in its efforts to acquire a franchise, the quest for a professional baseball team took on a life of its own, and by the time the takings occurred, the primary beneficiary of the City’s contribution to the project was not the public. There is no single defining moment that marks the City’s departure from its basic obligation to protect the public interest and guard against improper diversion of public funds and privileges for the benefit of private persons and entities. It was a gradual process marked by the mayor’s lack of concern regarding separate interests in the stadium project.
The court earlier noted that the mayor considered Mr. Graney an agent of the City and Mr. Graney considered himself a member of the mayor’s official cabinet. There was never any meaningful attempt by *407 the City to separate the City and SBC’s common goal of local baseball from their separate financial interests in the stadium project. The facts are already amply detailed, but the essential facts that establish bad faith bear repeating in summary form:
Mr. Graney, with the mayor’s approval, acted as an agent for both the City and SBC with respect to all material events leading up to the takings.
1. At the end of 1998, SBC entered into a franchise agreement with the Northern League.
2. Under the terms of the agreement SBC was to field a baseball team in an approved stadium by the spring of 2001.
3. In January 1999, the mayor and SBC agreed that the stadium would be built on the three parcels at issue here. The mayor agreed that the City would pay a total of six million dollars for the parcels and they would be acquired by eminent domain. SBC would pay for the construction of the stadium and own it, subject to a reversionary right in the City.
4. The mayor and SBC knew that the subject parcels were within the North End Urban Renewal Zone and that the Dreison and Northgate parcels were redeveloped pursuant to the North End Urban Renewal Plan. They knew that the businesses were operating on those parcels in accordance with the use provisions of the Urban Renewal Plan. The mayor and SBC knew a privately owned athletic stadium was not a permitted use under the plan. They knew that an amendment to the Plan required the formal approval of the Commonwealth and the City Council, as well as other agencies.
5. In approximately February 1999, the mayor and SBC agreed that SBC, acting as the City’s agent, would attempt to purchase the Dreison parcel on behalf of the City. The mayor agreed that if SBC purchased the property, the City would then take the property by eminent domain from SBC and pay damages to SBC in an amount equal to the purchase price. Such an arrangement, if successful, would establish land damages for the Dreison parcel in a sum certain. At the same time, the mayor and SBC agreed that SBC would attempt to negotiate a friendly taking agreement with Northgate. Northgate leased its premises to approximately fifteen businesses. The mayor and SBC’s goal was to have Northgate agree to sell its property to SBC. This would establish a fair market value. The plan envisioned that Northgate would agree to the proposed takings, provided the City Council awarded Northgate damages equal to the amount of the price agreed upon with SBC. The mayor and SBC devised the plan for the acquisition of the Northgate parcel for the specific purpose of circumventing the stringent business relocation requirements of G.L.c. 121B, the Urban Renewal Law. A friendly taking under G.L.c. 79 would permit the City to remove the business tenants in a far more expeditious manner.
6. In furtherance of this plan, SBC entered into a purchase and sale agreement with Dreison on April 22, 1999. The purchase price was two million three hundred thousand ($2,300,000) dollars. SBC was virtually unfunded. The sale was not consummated and the Dreison parcel was taken by the City in September 1999. SBC, pursuant to its agreement with the mayor, attempted to negotiate a friendly taking with Northgate, to no avail. Northgate’s property was taken by the City in September 1999. The takings were made under G.L.c. 79.
7. In the summer of 1999, a City Councillor asked the City Solicitor for information regarding the Dreison purchase and sale agreement, including the sales price. The mayor knew of the request and declined to provide the information to the City Councillor. The City Solicitor informed the City Councillor that the City was not a party to the Dreison sales agreement. In fact, SBC was acting as the City’s straw purchaser in entering into the agreement with Dreison.
8. In applying for the CDAG and PWED grants, the mayor and his agents knowingly made material misrepresentations to the Commonwealth in order to secure four million ($4,000,000) dollars in state funding to finance the City’s acquisition of the stadium site. Among those statements: The mayor represented to the Commonwealth that the manufacturing plant on the Dreison parcel was obsolete. He knew this was not true. He represented that the proposed stadium did not require an amendment to the North End Urban Renewal Plan. Not only did he know this was not true, one of the reasons he and SBC framed the February 1999 acquisition strategy was to circumvent the Urban Renewal Law, G.L.c. 12 IB. The mayor, in responding to the Commonwealth’s concerns regarding the proposed stadium’s placement in an urban renewal zone, knowingly adopted SBC’s counsel’s misleading statements of the project area. The Commonwealth asked the City to supply it with job information relating to the businesses on the Dreison and Northgate parcels. The mayor replied that the City did not have specific job information relating to the businesses that will be relocated. This was a knowing misrepresentation. The mayor knew that at least sixty people were employed at the manufacturing plant located on the Dreison parcel. The mayor knew that over two hundred people were employed in fifteen businesses located on the Northgate parcel.
9. The mayor agreed to the terms of the proposed ground lease. The proposed lease terms primarily benefit SBC, not the City:
a. The City does not receive any rent under the lease.
b. If SBC assigns the lease, the assignee would not owe the City rent. The assignment restriction does not prohibit or curtail assignment or subletting based on the status of the assignee or sub-lessee. Thus SBC can *408 assign, through gift or purchase, the lease to a for-profit corporation or other business enterprise.
c. SBC, or its assignee, would own the stadium during the twenty-five to fifty year lease term. Title to the stadium vests in the City at the end of the lease. The City does not know the useful life of the stadium.
d. SBC would pay one hundred thousand ($100,000) dollars annually in lieu of taxes from net operating income. This obligation is subordinate to SBC’s expected primary and mezzanine financing agreements. The City and SBC do not expect that SBC will have any net operating income.
e. The City’s right to use the stadium is secondary to the professional baseball use, and also is personal and may not be assigned to a third party.
f. Upon demand, SBC would indemnify the City for land damages in excess of six million ($6,000,000) dollars. SBC’s indemnification obligation is limited to net operating income.
g. SBC would have the right to participate in the City’s legal defense of any land damage case arising from the takings, including selection of the City’s defense lawyer.
At trial, the mayor testified that the City and SBC had the same mission and the same goals. Clearly he considered the City and SBC as one entity — what was good for one, was good for the other. In its legal submissions to the court, the City somewhat recasts this view. Essentially, the City claims that the not-for -profit status of SBC makes it some type of quasi-governmental entity. Thus, the court is to view this entire stadium acquisition and construction scheme as simply two governmental entities, one official and the other de facto, working together for a public purpose. If the court follows that trail, then it doesn’t matter which entity receives the primary benefits from the land takings and the expenditure of public funds. The law does not support the City’s position. In Bello v. South Shore Hospital, 384 Mass. 770 (1981), the Supreme Judicial Court rejected physicians’ claims that a private hospital’s denial of staff privileges to some physicians was not subject to judicial review as state action under the Fourteenth Amendment of the United States Constitution. The Court, quoting from Levin v. Sinai Hospital of Baltimore City, Inc., 186 Md. 174, 178 (1946), stated:
The essential difference between a public and private corporation has long been recognized at common law. A public corporation is an instrumentality of the state, founded and owned by the state in the public interest, supported by public funds, and governed by managers deriving their authority from the state. Public institutions, such as state, county and city hospitals and asylums, are owned by the public and are devoted chiefly to public purposes. On the other hand, a [not-for-profit] corporation . .. supported largely by private contributions, and managed by officers and directors who are not representatives of the state or any public subdivision, is a private corporation, although engaged in charitable work or performing duties similar to those of public corporations.
Bello v. South Shore Hospital, supra, at 773-74.
Alternatively, the City contends that the expenditure of public funds to enable a private charitable corporation to carry out its purpose is in itself a legitimate public purpose. Quite simply, that type of expenditure is prohibited by the anti-aid amendment, art. 18, as amended by arts. 46 and 103, of the Amendments to the Constitution of the Commonwealth, which forbids the use of public money for the purpose of “maintaining or aiding any . . . institution ... or charitable or religious undertaking which is not publicly owned.” In this regard, the City’s reliance upon Helmes v. Commonwealth, 406 Mass. 873 (1990), is misplaced. In Helmes, the Supreme Judicial Court held that a state expenditure to help preserve the battleship U.S.S. Massachusetts, did not violate the anti-aid amendment. The state’s contribution was made to preserve an historic war memorial which the United States Navy placed in the trust of a charitable corporation. Unlike SBC, the U.S.S. Massachusetts Memorial Committee, Inc. had one stated corporate purpose — the preservation of an historic relic. The Court in Helmes analyzed whether the state donation aided the Memorial Committee “in a way that is abusive or unfair, economically or politically,” id. at 878, and determined there was no such abuse. The same cannot be said here.
The court has taken into consideration the fact that SBC is a not-for-profit corporation rather than a profit-making business. However, the evidence of bad faith by the City in the land takings and the misrepresentations of the grant applications for public funds was so clearly done primarily to benefit SBC that the corporate nature of SBC does not undo the wrong.[18]
CONCLUSION
We end where this all began — the City’s petition to prevent the referendum petitions from being laid before the City Council. The City’s request is moot. The takings are invalid as a matter of law and are ordered set aside in accordance with the court’s Declaration of the Rights of the Parties and Order for Entry of Judgment, which is filed herewith.

The taking orders referenced the parcels by number.

The Conefam trustees are Gilbert Cohen and Andrew Cohen.

The Dashevsky trustees are Marc A. Dashevsky, Samuel S. Dashevsky, and Russell Seelig.

Lessard, et al. v. City of Springfield, et al. (Hampden S.Ct. 99-1281). The plaintiffs, three Springfield taxpayers, challenged the authenticity of signatures on the referendum petition. They claimed that less than 12% of Springfield’s registered voters actually signed the petitions. On November 8, 1999, the court (Page, J.) preliminarily enjoined the City *409 Clerk “from proceeding in any manner in providing or submitting the referendum petition to vote by the City Council." Two months later, the case was dismissed by agreement of the parties.

These are the same taxpayers who were the plaintiffs in the Lessard case. (See fn. #4.)

G.L.c. 121B, §47, requires that a person aggrieved by a taking made pursuant to the powers granted under the Urban Renewal Act may file a petition for a writ of certiorari “in the supreme judicial or Suffolk superior court sitting in Suffolk county ..."

The court ordered the City Council joined as necessary parties in the action brought by the City.

Theodor Geisel, a Springfield native, authored the Dr. Seuss series of children's books.

The Northern League resulted from a merger between Northern League, Inc., a South Dakota corporation, and an unincorporated association of baseball teams formerly known as the Northeast League. The merger was being finalized when SBC entered into the franchise agreement.

The pertinent provision of G.L.c. 79, §7A, states: "An award of damages made pursuant to section six . . . shall not be made until at least one appraisal has been made in accordance with section twelve on behalf of the taking authority.”

Because of the taking, the City was obligated to pay relocation expenses. This accounts for most of the $650,000 difference between the sales price in the SBC/Dreison agreement and the amount the City Council awarded in pro tanto damages.

 defendants Powell and Fettes contend that the two million dollar PWED grant was illegal because it was applied to a purpose not allowed by law. While the court is legally curious how the stadium land acquisition project qualified under the 1981 Transportation Bond Act and the regulations promulgated thereunder, the central question before the court is whether a municipality’s power of eminent domain inherently includes the power to take property for the purposes and circumstances attendant on this case. The answer to that question does not turn on whether the Department of Transportation and Construction exceeded its authority in awarding the PWED grant to the City. Furthermore, neither the Commonwealth nor the Secretary of the Department are parties to this case and thus the issue is not properly joined.

In his August 1999 letter, Mr. Brown recites the definition of “decadent area” as it appears in identical language in both G.L. Chapters 121A and 121B.

The statute was repealed in 1969 when the Urban Renew Act, G.L.c. 121B, was enacted. Most of the provisions of St. 1938, c. 484 are contained in modern form in G.L.c. 121B.

The quoted language is that of the justices who paraphrased eight legislative questions regarding the stadium complex portions of the proposed bill.

The Authority was created as a public instrumentality by St. 1952, c.354. Its original purpose was to construct, maintain, repair and operate the Massachusetts Turnpike. §1. It is considered a public corporation. Luke v. Massachusetts Turnpike Authority, 337 Mass. 304, 308 (1958). The only power of the authority is the power granted by statute.

The stadium design includes private boxes for anticipated corporate patrons, as well as other amenities consistent with the business of minor league baseball.

It is interesting to note that SBC did not attempt to avail itself of the provisions of G.L.c. 121A (Redevelopment Corporation Law). As a not-for-profit corporation, SBC was eligible to apply to the Department of Housing and Community Development for authority to undertake a redevelopment project, including a recreation project, in a blighted open area, decadent area or sub-standard area. (G.L.c. 121A, §§1, 7.) If successful in obtaining approval by various local and state agencies, a redevelopment corporation can apply to take land by eminent domain or it can lease land from a city. The eminent domain provisions are stringent. (G.L.c. 121A, §11, §7A.) However, before it may undertake a project, there must be public hearings before municipal boards and the city council. The city council must determine whether the project area is in fact blighted, decadent or sub-standard. Additionally, the city council must decide whether the project is detrimental to the best interests of the public or city, or whether the proposed project will constitute a public use and benefit. (G.L.c. 121A, §6.) If the project is approved by the mayor and city council, the mayor and developer must contract that the project will be carried out in accordance with G.L.c. 121A, including the rules and regulations promulgated thereunder. (G.L.c. 121A, §6A.) A not-for-profit corporation is obliged to make payment-in-lieu of taxes. The in-lieu-of-tax payments are determined in accordance with specific standards. Payments are not conditional nor is the payment obligation subordinate to other debt obligations. (G.L.c. 121A, §10.) Any surplus earning must be used in further urban development projects. (G.L.c. 121A, §9.)